Filed 12/29/11

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| In re RICHARD SHAPUTIS | ) | S188655 |
| | ) | |
| on Habeas Corpus. | ) | Ct.App. 4/1 D056825 |
| | ) | San Diego County |
| | ) | Super. Ct. No. HC18007 |
| _____ | ) | |

Here we reaffirm the deferential character of the "some evidence" standard for reviewing parole suitability determinations. Whether to grant parole to an inmate serving an indeterminate sentence is a decision vested in the executive branch, under our state Constitution and statutes. The scope of judicial review is limited. The "some evidence" standard, which we articulated in *In re Rosenkrantz* (2002) 29 Cal.4th 616 (*Rosenkrantz*) and refined in *In re Lawrence* (2008) 44 Cal.4th 1181 (*Lawrence*), is meant to serve the interests of due process by guarding against arbitrary or capricious parole decisions, without overriding or controlling the exercise of executive discretion. (*Rosenkrantz*, at pp. 664-665; *Lawrence*, at p. 1212.)

This is our second grant of review to consider whether a majority of Division One of the Fourth District Court of Appeal properly applied the "some evidence" standard to a decision denying parole for petitioner Richard Shaputis. Previously, we decided the majority had correctly asked whether the evidence supported a finding that petitioner posed a current threat to public safety, but improperly substituted its own conclusion for that of the Governor. (*In re Shaputis* (2008) 44 Cal.4th 1241, 1255 (*Shaputis I*).) We held that some evidence

1

supported the Governor's decision that paroling petitioner would pose an unreasonable risk of danger to society due to (1) the gravity of the offense, which was a culmination of years of domestic abuse inflicted by petitioner on his wife and family, and (2) petitioner's lack of insight and failure to accept responsibility for his actions. (*Id*. at pp. 1258-1261.)

We now conclude that the Court of Appeal majority has again invaded the province of the parole authority, in this case the Board of Parole Hearings.[1] After our decision in *Shaputis I*, petitioner refused to be interviewed by the psychologist appointed by the California Department of Corrections and Rehabilition (CDCR) to perform a comprehensive risk assessment for the Board's consideration. Instead he hired his own psychologist, who submitted a report. Petitioner also refused to testify at his parole hearing. He chose to submit a written statement prepared with the assistance of counsel. The Court of Appeal majority gave credence to these sources of information, and faulted the Board for relying on earlier psychological evaluations and statements by petitioner. However, it is not for the courts to reweigh the evidence before the Board, and an inmate who restricts the Board's access to current information is in no position to complain about the Board's reliance on other relevant evidence. The "some evidence" standard does not permit a reviewing court to reject the Board's reasonable evaluation of the evidence and impose its own judgment.

We also take this occasion to offer some general guidance to the Courts of Appeal on inmates' lack of insight as a parole unsuitability factor. As noted by the

---

[1] Hereafter, we use "Board" to refer both to the Board of Parole Hearings and its predecessor, the Board of Prison Terms, which reviewed petitioner's suitability for parole in hearings held before July 2005. (See *Shaputis I*, *supra*, 44 Cal.4th at p. 1245, fn. 1.)

majority below, lack of insight has played an increasingly prominent part in parole decisions and the ensuing habeas corpus proceedings.

## I. BACKGROUND

### A. *Procedural History*

Petitioner was convicted of a second degree murder committed in 1987, and was sentenced to a term of 15 years to life in prison with a two-year enhancement for firearm use.  His minimum eligible parole date was in 1998.  The Board found him unsuitable for parole at hearings held in 1997, 2002, and 2004.  After the third denial, petitioner sought a writ of habeas corpus, which was denied by the trial court.  Petitioner took his application to the Fourth District Court of Appeal, which granted him relief in a split decision.  The Board was ordered to vacate its denial of parole, conduct a new hearing, and refrain from relying on the same findings it made in 2004 unless there was new or different evidence.

Constrained by these directions from the court, the Board found petitioner suitable for parole at a hearing in March 2006, though the presiding commissioner stated that she continued to believe he was unsuitable for the reasons stated in the Board's 2004 decision.  In August 2006, Governor Arnold Schwarzenegger reversed the Board's decision.  Petitioner again sought a writ of habeas corpus from the trial court, lost, proceeded to the Court of Appeal, and succeeded in persuading a majority of that court to grant him relief.

We granted review, and considered the matter in conjunction with *Lawrence*, *supra*, 44 Cal.4th 1181.  In *Lawrence*, we held that the "some evidence" standard of review applicable to parole suitability determinations applies not simply to the factors relied on for denial, but to the ultimate decision on whether the inmate's release will unreasonably endanger public safety.  (*Id*. at p. 1209; see also *id*., p. 1235 (dis. opn. of Chin, J.) [agreeing with the majority on this point].)  In *Shaputis I*, we decided that even though the Court of Appeal

3

majority had properly framed its inquiry, it had failed to defer to the Governor's determination that petitioner remained dangerous, which was supported by some evidence.  (*Shaputis I*, *supra*, 44 Cal.4th at p. 1255.)  Accordingly, we reversed the Court of Appeal's judgment.  (*Id*. at pp. 1259-1261.)

Petitioner appeared for another parole hearing in 2009.  The Board denied parole, basing its decision on the circumstances of the offense as well as petitioner's failure to gain insight into his behavior and take responsibility for his crime.  Petitioner unsuccessfully petitioned the trial court for a writ of habeas corpus.  For the third time, however, a majority of the Court of Appeal granted him relief.  We granted the Attorney General's petition for review.

B. *The Commitment Offense*

Petitioner was 50 years old when he murdered his wife.[2]  On January 24, 1987, his neighbor heard a gunshot between 8:30 and 9:00 p.m.  At 9:58 p.m., petitioner called 911.  He was screaming and the call was cut off.  Petitioner called back immediately and told the dispatcher that he and his wife had had "a little fight" and he shot her.  She was dying and needed help.  Petitioner said he had not known the gun was loaded.  The dispatcher kept him on the telephone until police officers arrived at his house, then directed him to go outside with his hands in the air.  The police arrested petitioner, entered the house, and found his wife Erma dead on the living room floor, with a cocked revolver lying nearby.  An open box of ammunition rested on a table.

---

[2]     We draw primarily on the statement of facts in the unpublished opinion affirming petitioner's conviction, filed May 21, 1991, which the Board incorporated by reference at the 2009 parole hearing below.  As noted in that opinion, petitioner had been retried after his first conviction of second degree murder was reversed by the Court of Appeal due to improperly admitted evidence.

The cause of death was a single gunshot wound to the neck, inflicted at close range. It was likely that petitioner was sitting and Erma was in the process of standing up or bending forward when he shot her. She had probably died within a second or two. Her body lay face up and was cold to the touch. Blood had partially dried on her face, neck, and head. Postmortem lividity, caused by pooling of the blood, had developed on the lower parts of her right leg and arm.

The murder weapon could not be fired unless the hammer was manually cocked before the trigger was pulled. A "transfer bar" prevented accidental discharge by making the gun impossible to fire unless the trigger was pulled and held back.[3] The gun was in excellent working condition. Another handgun and three rifles were in the house. All the other guns were unloaded. Both petitioner and Erma had been drinking. Her blood-alcohol level was .22 percent. Petitioner was not tested initially because the officers did not think he was intoxicated. At 3:00 a.m., his blood-alcohol level was .14 percent. Petitioner presented evidence that the level could have been .24 percent at 10:00 p.m.

Petitioner made a number of spontaneous statements while being guarded at the police station, among them: "I dialed 911." "I had the gun. It went off. And then went off again." "I don't know why it went off." "She was my baby." "She said dial 911." At trial, two of petitioner's daughters testified about past incidents of domestic violence between the spouses, including a prior shooting incident.

---

[3]     In each of the three opinions granting habeas corpus relief to petitioner, the Court of Appeal majority noted that these safety features of the gun were recited in CDCR reports, but stated that the factual basis for the information was unclear. To the contrary, the opinion affirming petitioner's conviction makes it plain that this evidence was presented at trial.

Erma's parents testified that when he was upset with Erma, petitioner would sometimes threaten to send her "home in a box." They thought he was joking.

C. *Petitioner's History of Domestic Violence*

Information about petitioner's long history of domestic violence was developed in the probation report and the CDCR reports prepared in connection with the parole hearings. Petitioner's first wife had divorced him after suffering severe physical abuse. On one occasion, he jumped on her stomach when she was pregnant, causing her to miscarry. Petitioner also abused his four daughters, sometimes holding a knife to their throats when he thought they had misbehaved. He singled out one daughter in particular, because she was the weakest emotionally. His daughter Annette said petitioner was a different person behind closed doors than he was when others were present.

One daughter remained in petitioner's custody following the divorce, and lived in his home until 1978. Petitioner and Erma were married in 1964. His daughter saw petitioner beat Erma on several occasions, and noticed large bruises on her body. Around 1972, he beat Erma so badly that she needed plastic surgery. In 1978 his daughter, then 16, accused petitioner of raping her twice when he was intoxicated. He was charged with rape by threat and with incest, but pleaded no contest to reduced misdemeanor charges. Between 1981 and 1986, a friend noticed bruises on Erma every four to six months. Erma told her that petitioner flew into rages and beat her. Around 1985, Erma complained that he had cracked her ribs. About 18 months before the murder, petitioner shot at Erma.

Petitioner's criminal record before the murder encompassed more than the conviction arising from the molestation of his daughter. He was arrested in 1966 for check fraud, although this charge was later dismissed. In 1975, he was convicted of failing to pay child support. In 1978, he was arrested for pandering, convicted of an unspecified offense, and sentenced to 30 days of work furlough.

In 1979, he failed to register as a sex offender as required by his molestation conviction. He was arrested at least once for driving while intoxicated.

D. *Petitioner's Statements About the Offense*

Petitioner has made various statements about Erma's murder during his years in custody. At his parole hearing in 1997, he claimed he had shot Erma by accident; they did not fight before the shooting; she had handed him the gun for his own protection; he did not know the gun was loaded; and he had not aimed at her. When petitioner was interviewed for a CDCR report before his 2004 parole hearing, he declined the opportunity to amend this version of the offense. A 2004 Board report quotes petitioner as saying that after he and his wife had a few drinks, Erma told him there had been a prowler in the neighborhood and wanted him to look at one of his guns to see if she could use it. "She sat the gun on my lap in a leather case. I took it out and the shells that were in the box fell out. I picked up the gun and pointed at the fireplace. I said, 'bang,' and pulled the trigger at the same time. The gun went off. I saw my wife on the floor. I did not see her before that. I ran around the house screaming and then called 911 after I found the phone."

When interviewed by a psychologist in 2004, petitioner explained that he and his wife were both drunk, and she was upset about a purchase of "some carnival glass" that evidently was broken during shipment. After the subject of the prowler came up, "she gave me the gun and it was loaded, but I didn't know that. I pulled out the gun. This part nobody wants to believe. I pointed the gun and pulled the trigger just when she bent over and it went into her neck and killed her. I didn't want to kill her. It was an accident." Asked whether there was an argument, petitioner replied: "No, we talked about the carnival glass. I don't remember the whole thing. I do remember shooting my wife, then called 911. The worst thing about the crime was drinking. I shouldn't have had a firearm.

The argument was stupid. It was the most stupid thing I've ever done in my life. I still miss her. We were good friends and loved each other."

In 2009, petitioner's privately retained psychologist described his recitation of the offense as "essentially consistent" with the versions she saw in prior reports. She wrote that petitioner "has long since achieved compelling insights into the causes that resulted in his need to remain in an unhappy long term marriage and the reasons for his inability to leave the marriage. 'I know why I could not leave the marriage and the alcoholism exacerbated my fears. I was scared of being alone and felt I had no other choice but to continue on with Erma. I take responsibility for her being shot. I was drunk and had no sense of what happened when the gun was dropped in my lap. I am not that person and haven't been for many years.' "

E. *Petitioner's Relationships with Others*

Regarding the molestation of his daughter, in 2001 petitioner admitted he had touched her inappropriately but denied that intercourse occurred. In 2005, however, he denied the allegation entirely, claiming he had wandered into his daughter's room by mistake. A 2006 psychological report observed that petitioner found her accusations "inexplicable." Petitioner had a flat affect when discussing the allegations, which could be a sign of the schizoid tendencies noted in some previous evaluations. When questioned by the Board at his 2006 parole hearing about whether he had a problem in the way he treated women, petitioner replied, "Well, no I don't. I don't know how to say that I don't have a problem now. I didn't have a — I guess I had a problem then but I don't know how to put it into pictures or words. I just— it was one of those things I didn't quite understand, I guess. Not having a thorough idea of how stupid I was being, how dumb I was being." Petitioner's counsel advised him not to answer when he was asked to

explain his understanding of why he had committed the murder and how he was "different today."

The 2004 psychological evaluation stated that the "atypical, detached, almost schizoid quality to some of petitioner's earlier relationships" was suggestive of early trauma that petitioner chose not to discuss. The report further noted that petitioner had a "reduced" ability to achieve self-awareness and develop relationships with others. Petitioner's mother had deserted the family when he was nine, and he was left to care for his six younger siblings during his father's extended absences from the home. The probation report and a 1997 CDCR report stated that petitioner's father had physically abused him. He denied this in 2004, but the 2009 report prepared by his psychologist related petitioner's description of his father as physically abusive.

At his 2006 parole hearing, it emerged that petitioner had no contact with his siblings, daughters, or first wife. In 2005 he had married a second cousin, who was herself a recovering alcoholic. The psychologist who prepared an evaluation in 2005 confirmed the earlier finding that there was a "schizoid quality" to petitioner's "interpersonal relationships," and noted that he seemed to have "limited . . . insight" into his antisocial behavior and the association between his alcohol abuse and his history of domestic violence. The report stated that "there appears to be little potential benefit at this point in his development to attempt to modify this [character-based] structure." The psychologist was concerned about petitioner's plan to reside with his new wife, given his history of domestic violence, but nevertheless concluded that the risk he would resume this pattern was probably low if he abstained from alcohol. The report recommended random alcohol testing, a mandatory relapse prevention program, and a community-based domestic violence program as conditions of parole.

9

Indeed, all the CDCR psychological reports, from 1997 until 2009, found that petitioner would probably pose a low risk of threat to the public if released on parole, so long as he refrained from using alcohol. His behavior in prison has been uniformly exemplary. He has completed numerous rehabilitation programs. He has repeatedly been commended by prison staff for his work, conduct, and reform efforts. Petitioner had a stable employment history before he murdered his wife. He worked for San Diego Gas & Electric Company as an electrician and fabricator for seven years, owned his own welding business, and for the 13 years preceding the murder was employed by Bechtel Corporation as a supervisor.

F. *The 2009 Hearing*

At the latest hearing in August 2009, petitioner was 72 years old. It was noted that he had a comfortable private income from a union pension, Social Security, and some savings. He planned to live with his wife in a retirement community. Petitioner suffers from high blood pressure and has had three heart attacks, the most recent in 2003. He was recovering from shoulder surgery at the time of the hearing.

As noted, petitioner had declined to be interviewed by the psychologist appointed by CDCR to evaluate him in advance of the hearing, Dr. Nameeta Sahni.[4] Dr. Sahni prepared a report based on her review of the existing materials

---

[4] Petitioner refers us to a letter in the record from counsel for the Board, dated October 2008, to Donald Miller, whose role is not apparent from the record. The letter responds to a request from Miller that Dr. Jasmine Tehrani perform a psychological evaluation for petitioner's next parole hearing. Counsel informed Miller that a psychological evaluation had been done by Dr. Gary Hitchcock on April 30, 2008, and that Dr. Tehrani was of the opinion that there was "no clinical need" for a new evaluation of petitioner.

Dr. Sahni, who met with petitioner in April 2009, noted that she had reviewed an evaluation by Dr. Hitchcock, which she parenthetically described as

*(footnote continued on next page)*

10

in petitioner's record, but emphasized that her inability to interview petitioner limited her evaluation of his current condition. At the hearing, petitioner declined to speak about the murder or his social history. The only newly developed evidence before the Board came from a May 2009 report by petitioner's privately retained psychologist, and the written statement petitioner prepared with the assistance of counsel.

Petitioner's retained psychologist, Dr. Barbara Stark, reviewed petitioner's file, interviewed him for five and a half hours, and gave him a number of psychological tests. All the results were in the normal or average range. Dr. Stark believed the emotional and physical abuse petitioner suffered as a child had deprived him of a chance to develop "critical coping abilities," but that in the last several years he had undergone significant and positive behavioral, emotional, and cognitive changes. Dr. Stark's report noted that petitioner had never been treated for mental problems in prison, that he had a history of severe alcohol dependence but had completed treatment programs in prison, and that his behavior in custody had been excellent. The report took issue with the Board's previous finding that petitioner had a history of unstable and tumultuous relationships. According to Dr. Stark, "the sum of his relationships" was "the relationship with his wife and

_____

*(footnote continued from previous page)*

"a refusal, dated less than a year ago, on 6/23/08 [*sic*]." Dr. Sahni reported that petitioner was initially confused as to whether she was his retained psychologist. Ultimately, he was unwilling to participate in an interview without consulting his attorney. Dr. Sahni told petitioner that if he declined the interview her report would be based on his records, and that another interview would not be scheduled for him. Petitioner "stated that he understood and wished the undersigned evaluator a nice day."

11

misconduct with his daughter while under the influence," which "does not meet the level of a history of 'unstable tumultuous relationships.' "

After asserting that petitioner's account of the murder had been consistent over the years, Dr. Stark stated: "It is clear from reviewing the legal documentation that there are inconsistencies in the judicial proceedings and he has continued to accept responsibility for the offense. This has been misinterpreted as a lack of insight and remorse when he stated his version of the index offense as it occurred." She also reported that petitioner said he "has been quoted many times incorrectly when the relationship with his wife was discussed. It is clear that there were inconsistencies in the investigation regarding the logistics regarding the firing of the gun during the index offense."

The report discussed petitioner's insight at length, opining that his behavior had been caused by unmet emotional needs and his dependence on alcohol. "He gives these as no excuses and those behaviors no longer exist in his present day life. He related his past behavior was a need to make himself feel good and he behaved in a self-centered manner to obtain those feelings that resulted in a tragedy that took his wife's life. He spoke about his early need to be accepted and ended up in a death of his wife." Dr. Stark attributed the following statements to petitioner: "In the past I never knew what they meant by insight and no one asked about my feelings as a child how they made me fearful and dependent and not ever wanting to be poor." "I can see how my never having been connected to others severely impaired my judgment. I never even thought at the time of the consequences of my drinking and my wife's drinking and our continuous arguments. I really had no understanding, as unbelievable as that may seem. Since that time I've done a lot of intensive groups regarding how my low self esteem, horrible substance abuse caused my detachment. I'm astonished at the time of the offense at my lack of any thoughts that this situation was out of hand."

Asked specifically about the crime, petitioner said: "I am aware of what I did every day. There were so many warning signs I chose to ignore. It was stupid and at the time I had no sense my actions in my home environment would lead to my wife's death." Dr. Stark concluded that petitioner posed a low risk of recidivism, and should be released on parole.

In the written declaration petitioner prepared with counsel, he explained that he had not previously addressed the matter of "insight" because he misunderstood it and had been questioned about it "only superficially." The substance of the statement is as follows:

"4. Because of a fading memory, probably due to my age and illnesses, I do not have a vivid recollection of all of my previous conduct, but I do remember that I abused my wife and at least one of my daughters. I also recall my drinking habits and severe addiction to alcohol.

"5. I do recognize the destructive effects of my drinking and how it terribly impaired my judgment. Over time and with treatment I have come to know that I would not have committed such horrific acts but for alcohol, but I blame myself and low morality, not alcohol, for my crime and former misconduct. Most alcoholics, those with decent character and morality, do not commit such acts.

"6. In my treatment and soul searching over the years I have addressed and dealt with this issue of morality, and with the requirement of lifelong sobriety. On the former subject, I was self-centered and did not respect the needs of my wife and children. Although that was compounded and exacerbated by drinking, the basic flaw was in my own character.

"7. Although I have come to understand these issues, when I look back at the way I answered questions asked by the Board and the Board's psychologists, I focused almost entirely on my present and future sobriety, and failed to adequately explain how deeply regretful I feel about my past. . . . I am making this written

13

statement because it is now more difficult, due to my memory and illnesses, to immediately understand and reply spontaneously to questions, particularly about my past. My shame about my horrible conduct and how it impacted the victims has also played a role.

"8. I want the Board, and everyone, to know that I will [*sic*] and can never again engage in such terrible conduct. How repulsive it is to me now serves as a powerful deterrent. I have learned to recognize and deal with stress in a socially acceptable manner (in this very stressful environment) and am committed to sobriety for life. . . . Because I am not mentally the same person as before, I think entirely differently, respond to stress differently, and have no use for alcohol, and because I will always feel deep sorrow for my victims and know that I am completely responsible for the offense and my previous conduct, I could never again engage in such behavior."

The Board's decision to deny parole was based on the commitment offense, the long history of domestic abuse that led up to it, and defendant's failure to accept responsibility or gain insight into the reasons for the abuse and the murder. The Board recounted the history of petitioner's domestic violence, and rejected Dr. Stark's opinion that he had no history of tumultuous relationships. He had repeatedly abused both Erma and his first wife, and molested his youngest daughter, who remained in his care after his first wife left with the three older children. He had admitted only to fondling his daughter, and blamed the rest of his behavior on alcohol. The Board was skeptical that petitioner had accepted responsibility for his actions, pointing out that the expressions of remorse in his written statement and in Dr. Stark's report were the first to appear in the record. The Board questioned petitioner's credibility, observing that he had made inconsistent statements about whether his father had been abusive. The Board

14

found that petitioner had perpetuated a pattern of domestic violence, and failed to perceive the underlying causes of that violence.

The Board further pointed out that petitioner had never provided a coherent explanation of how Erma came to be shot, maintaining his claim that the killing was accidental in the face of strong evidence to the contrary. It discredited his explanation that he had misunderstood what was meant by "insight," noting that this is a commonly understood term. The Board referred to a statement in petitioner's 2004 psychological evaluation, to the effect that he had yet to accept responsibility for the murder and relied on denial and rationalization to handle stress, defenses that were firmly entrenched and unlikely to change.

G. *The Habeas Corpus Proceedings*

The trial court denied petitioner's habeas corpus petition, observing that he had hampered his cause by refusing to speak to the Board, although he was not required to do so. The court found the record "replete with . . . reasons" for denying parole, based on the evidence before the Board. The Court of Appeal majority, on the other hand, concluded there was "no evidence to support a finding that [petitioner] would currently pose an unreasonable risk of danger to society were he released on parole." The majority accepted petitioner's written statement and Dr. Stark's psychological evaluation as the only current evidence of petitioner's dangerousness, and faulted the Board for its reliance on outdated information. The dissenting opinion commented that the majority simply disagreed with the weight the Board had given to the evidence before it, whereas the deferential standard of review in parole cases requires the court to credit the Board's findings when they are supported by a modicum of evidence.

15

## II. DISCUSSION

This case turns on the application of the "some evidence" standard of review.[5] We discuss first the handling of that standard by the Court of Appeal majority below. Next, we consider petitioner's arguments that the Board's reliance on his lack of insight deprived him of due process. We proceed to some general observations on an inmate's degree of insight as a factor in parole suitability determinations, and conclude with a brief summary of the principles governing judicial review of those determinations.

A. *The Majority's Application of the "Some Evidence" Standard*

As we have explained, in *Lawrence* we "resolved a conflict among the appellate courts regarding the proper scope of the deferential 'some evidence' standard of review we set forth in *Rosenkrantz, supra*, 29 Cal.4th 616 . . . . We clarified that in evaluating a parole-suitability determination by either the Board or the Governor, a reviewing court focuses upon 'some evidence' supporting the core statutory determination that a prisoner remains a current threat to public safety — not merely 'some evidence' supporting the Board's or the Governor's characterization of facts contained in the record. Specifically, we explained that, because the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety, and because the inmate's due process interest in parole mandates a meaningful review of a decision denying parole, the proper articulation of the standard of review is whether there exists 'some evidence' demonstrating that an

---

[5] The body of statutes and regulations that generally govern the Board's parole considerations is set out in *Lawrence*, *supra*, 44 Cal.4th at pages 1201-1203, and *Shaputis I*, *supra*, 44 Cal.4th at pages 1256-1258. (See also *In re Prather* (2010) 50 Cal.4th 238, 249-251.)

16

inmate poses a current threat to public safety, rather than merely some evidence suggesting the existence of a statutory factor of unsuitability. (*Lawrence*, *supra*, 44 Cal.4th at p. 1191.)" (*In re Prather*, *supra*, 50 Cal.4th at pp. 251-252.)[6]

Here, the Court of Appeal majority appears to have misconstrued the "some evidence" standard by stating that the factors relied upon to find an inmate unsuitable for parole must be "demonstrably shown by evidence in the record." To the extent the adverb "demonstrably" suggests a reviewing court is free to determine whether the evidence establishes the existence of a particular factor, or that anything other than "some evidence" is required to support a finding by the Board or the Governor, this formulation was erroneous. We have never used such terminology in connection with review of parole decisions. In another context we have adopted a "demonstrable reality" standard, governing review of the grounds for removing a sitting juror. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.) There we made it plain that such a standard is *less deferential* than the substantial evidence standard, and requires a greater evidentiary showing.[7] Conversely, review under the "some evidence" standard is *more deferential* than substantial

---

[6] In *Prather*, we considered the appropriate remedy in cases where a reviewing court concludes that the Board's denial of parole is not supported by " 'some evidence.' " (*In re Prather*, *supra*, 50 Cal.4th at p. 243.)

[7] "A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question. . . . [¶] The demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established. It is important to make clear that a reviewing court does not reweigh the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*People v. Barnwell*, *supra*, 41 Cal.4th at pp. 1052-1053.)

17

evidence review, and may be satisfied by a lesser evidentiary showing. (*Rosenkrantz*, *supra*, 29 Cal.4th at pp. 656, 665.)

It is settled that under the "some evidence" standard, "[o]nly a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of [the Board or] the Governor. . . . [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of [the Board or] the Governor . . . . It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the . . . decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the . . . decision." (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 677; see also *Lawrence*, *supra*, 44 Cal.4th at p. 1204; *Shaputis I*, *supra*, 44 Cal.4th at pp. 1260–1261.)

The majority below lost sight of these cardinal considerations. It reasoned that the only evidence of petitioner's risk to public safety pertained to his dangerousness in the *past*, including the evidence we found sufficient to support the denial of parole in *Shaputis I*, *supra*, 44 Cal.4th at pages 1259-1260. It declared that this evidence had "evaporated considering the only current evidence as to his insight into and remorse for his conduct." The majority noted that in *Lawrence*, *supra*, 44 Cal.4th at pages 1223-1224, *In re Gaul* (2009) 170 Cal.App.4th 20, 38-39 (*Gaul*), and *In re Aguilar* (2008) 168 Cal.App.4th 1479, 1490 (*Aguilar*), the Board's reliance on outdated psychological evaluations had been deemed insufficient to supply "some evidence" of the inmate's threat to public safety.

18

This analysis is incompatible with the "some evidence" standard, and misapplies the holdings of *Lawrence*, *Gaul*, and *Aguilar*. While the evidence supporting a parole unsuitability finding must be probative of the inmate's current dangerousness, it is not for the reviewing court to decide *which* evidence in the record is convincing. (*Lawrence*, *supra*, 44 Cal.4th at pp. 1204, 1212.) Only when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion may a court overturn a contrary decision by the Board or the Governor. In that circumstance the denial of parole is arbitrary and capricious, and amounts to a denial of due process. (*Id*. at pp. 1204-1205.) It is true that often the most recent evidence as to the inmate's level of insight will be particularly probative on the question of the inmate's present dangerousness, but that is not *necessarily* the case. If the newest evidence is unreliable or insubstantial, the parole authority is not bound to accept it. Usually the record that develops over successive parole hearings has components of the same kind: CDCR reports, psychological evaluations, and the inmate's statements at the hearings. In such cases, the Board or the Governor may not arbitrarily dismiss more recent evidence in favor of older records when assessing the inmate's current dangerousness. That is what *Lawrence*, *Gaul*, and *Aguilar* stand for. (*Lawrence*, at pp. 1223-1224; *Gaul*, *supra*, 170 Cal.App.4th at pp. 38-39; *Aguilar*, *supra*, 168 Cal.App.4th at p. 1490.)

This is not such a case. Petitioner decided to limit the evidence available to the Board, by refusing to participate in an evaluation by a CDCR psychologist and declining to speak to the Board on any matter of substance at his parole hearing. The Board was unable to ask petitioner about the offense. It was also unable to question him about his psychologist's report, the statement he prepared with counsel, or his current state of mind. An inmate cannot make evidence in the record "evaporate[ ]," as the Court of Appeal majority curiously phrased it, by

19

pursuing such a strategy. Competent evidence does not evaporate. Its context may change in light of subsequent developments, but it does not disappear. The inmate is free to limit his participation in the process, but that choice cannot restrict the scope of the Board's review of the evidence.

Here, the Board noted that petitioner had the right not to participate in the hearing, but that as a consequence it was required to base its determination on other evidence in the record. The parole regulations specify that "[a] prisoner may refuse to discuss the facts of the crime *in which instance a decision shall be made based on the other information available* and the refusal shall not be held against the prisoner." (Cal. Code Regs., tit. 15, § 2236, italics added.)[8] The Board's consideration of "other information" is not limited to recent information the inmate has chosen to present. Nor does the Board hold a refusal to discuss the crime against the inmate when it weighs the credibility of such information against other evidence in the record. In determining whether an inmate may safely be paroled, it is legitimate for the Board to take into account that the record pertaining to the inmate's current state of mind is incomplete, and to rely on other sources of information. An inmate who refuses to interact with the Board at a parole hearing deprives the Board of a critical means of evaluating the risk to public safety that a grant of parole would entail. In such a case, the Board must take the record as it finds it.

Under the "some evidence" standard of review, the parole authority's interpretation of the evidence must be upheld if it is reasonable, in the sense that it is not arbitrary, and reflects due consideration of the relevant factors. (*Shaputis I*,

---

[8] Further references are to the parole Regulations found in title 15 of the California Code of Regulations.

*supra*, 44 Cal.4th at p. 1258; see *Lawrence*, *supra*, 44 Cal.4th at pp. 1204-1205.) Here, there is no claim that the Board neglected to consider any relevant factor. Nor was it arbitrary for the Board to doubt the credibility of the documentary evidence submitted by petitioner. The majority's attempts below to construe this evidence favorably to petitioner reflect a fundamental failure to accord the Board's decision the deference that the "some evidence" standard was designed to provide. (*Rosenkrantz*, *supra*, 29 Cal.4th at pp. 664-665.)

With regard to Dr. Stark's report, the Court of Appeal majority accepted her conclusion that petitioner had no "history of 'unstable tumultuous relationships,' " because "the sum of his relationships" was "the relationship with his wife and misconduct with his daughter while under the influence of alcohol." [9] The majority also accepted Dr. Stark's conclusions that petitioner's account of the crime, and his previous failure to demonstrate insight and remorse to the Board's satisfaction, were attributable to inconsistencies in the investigative and judicial proceedings that followed Erma's murder. However, as the Board noted, Dr. Stark's assessment failed to acknowledge petitioner's substantial history of abusing his first wife and his other three daughters. Furthermore, Dr. Stark failed to identify any particular "inconsistencies" except in regard to "the logistics regarding the firing of the gun during the index offense."

There is nothing inconsistent in the record on that point. The evidence at petitioner's trial established that the revolver had safety features preventing an accidental firing. The hammer had to be manually cocked, and the trigger firmly pulled. In any event, petitioner has never claimed that he did not mean to pull the

---

[9]     A "history of unstable or tumultuous relationships with others" is a parole unsuitability factor. (Regs., § 2402, subd. (c)(3).)

21

trigger. He has claimed that he thought the gun was unloaded, without explaining the open box of ammunition nearby. He has insisted he did not know his wife was in the way, without explaining how he could have overlooked her presence only a foot or two away.

The "some evidence" standard requires only a modicum of support for the Board's rejection of Dr. Stark's conclusions. This record amply provides such support. In addition to the points noted above, we observe that on the question of petitioner's understanding of the crime, Dr. Stark concluded: "He has developed over the years a consistent reality based view of his extremely destructive choices due to unmet needs and being substance dependent. . . . He related his past behavior was a need to make himself feel good and he behaved in a self-centered manner to obtain those feelings that resulted in a tragedy that took his wife's life. He spoke about his early need to be accepted and ended up in a death of his wife." It would be an understatement to say that Dr. Stark's report leaves an analytical gap between petitioner's self-centered behavior and early emotional needs, on the one hand, and his shooting of Erma at close range, on the other.

The majority below also found that the written statement petitioner submitted to the Board provided "affirmative evidence that he had grown to understand how his underlying character flaws, exacerbated by his alcohol abuse, had produced his criminal conduct." This generous reading of the statement would have satisfied the "some evidence" standard if the Board had found petitioner suitable for parole. It fails to comport with the standard of review, however, given the Board's finding of unsuitability.

In his written statement, petitioner did not discuss the murder at all. Indeed, nowhere in the record is there a coherent account by petitioner of the shooting and how or why it happened. Nowhere is his claim of accident reconciled with the evidence found at the scene. Nowhere does he plausibly

22

explain why he waited at least an hour after the shooting before calling for help.**10** Petitioner's statement also failed to address the charge that he had molested his daughter, acknowledging only that he had "abused . . . at least one of my daughters." In the statement, petitioner discussed his alcoholism, his "low morality," his deep regret, and his determination not to "again engage in such terrible conduct." However, the Board was left with no indication that petitioner understood why he shot his wife, what he had done in the incidents of molestation, or how his behavior affected his other daughters. A general recognition of moral deficiency and alcohol abuse is insufficient to explain an entrenched pattern of domestic abuse, child molestation, and a point-blank shooting. Indeed, the statement petitioner prepared with the assistance of counsel is so vague about the nature of his violent conduct that it might reasonably be deemed evasive.

Thus, just as the Board had grounds to doubt the reliability of Dr. Stark's psychological report, it was also reasonable for the Board to be unpersuaded by petitioner's written statement when it considered whether he had gained the insight that was found to be lacking in the *Shaputis I* proceedings. (*Shaputis I*, *supra*, 44 Cal.4th 1241.) Indeed, the same evidence that we found sufficient in *Shaputis I* was sufficient here to meet the "some evidence" standard, given the lack of a reliable record of his current psychological state. When there is a reasonable basis to conclude that the most recent evidence of an inmate's current

---

**10** The only evidence reflecting an attempt to account for this delay is a police report, read into the record at the hearing by the district attorney. When confronted by a detective about the delay, petitioner "stated that he ran around the house after the gun went off, trying to find the telephone." The district attorney noted that petitioner had lived in his house for 23 years. When the detective asked why he had not gone to the neighbor's to report the incident, petitioner "stated he couldn't find the front door."

dangerousness is less trustworthy than other evidence, a reviewing court must defer to the parole authority's evaluation of the record.

As noted in *Rosencrantz,* the " 'some evidence' standard is extremely deferential," and cannot be equated with the substantial evidence standard of review. (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 665.)  Nevertheless, it may be stated in terms parallel to that more familiar standard:  When reviewing a parole unsuitability determination by the Board or the Governor, a court must consider the whole record in the light most favorable to the determination before it, to determine whether it discloses some evidence — a modicum of evidence — supporting the determination that the inmate would pose a danger to the public if released on parole.  (Cf. *Jackson v. Virginia* (1979) 443 U.S. 307, 318–320; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)  The court may not, as the Court of Appeal majority did here, substitute its own credibility determination for that of the parole authority.  (Cf. *Jackson*, *supra*, at pp. 318-319; *Johnson*, *supra*, at p. 576.)  Any relevant evidence that supports the parole authority's determination is sufficient to satisfy the "some evidence" standard.  (See *Jackson*, *supra*, at p. 320.)[11]

---

[11]     Our concurring colleague suggests that "some evidence" review is restricted to evidence actually relied upon by the Board or the Governor.  (Conc. opn. of Liu, J., *post*, at pp. 4-5.)  However, nothing in the requirement that a parole denial be accompanied by a "statement of [] reasons" demands that the parole authority comprehensively martial the evidentiary support for its reasons.  (*In re Sturm* (1974) 11 Cal.3d 258, 272.)  It is axiomatic that appellate review for sufficiency of the evidence extends to the entire record, and is not limited to facts mentioned in a trial court's statement of decision, for instance.  (See *In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 49-50; Eisenberg et al., Cal. Practice Guide:  Civil Appeals and Writs (The Rutter Group 2010) ¶ 8:48, p. 8-22.)

*(footnote continued on next page)*

We urge the Courts of Appeal to bear in mind that while the "some evidence" standard "certainly is not toothless" (*Lawrence*, *supra*, 44 Cal.4th at p. 1210), and "must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights" (*id*. at p. 1211), it must not operate so as to "impermissibly shift the ultimate discretionary decision of parole suitability from the executive branch to the judicial branch" (*id*. at p. 1212). Under the framework established by legislation and initiative measure, the Board is given initial responsibility to determine whether a life prisoner may safely be paroled. (Pen. Code, § 3040.) The Governor is granted de novo review of the Board's decision, and is free to make his or her own determination, based on the same factors the Board must consider. (Cal. Const., art. V, § 8, subd. (b).)

Although, as we made clear in *Lawrence*, the ultimate conclusion on parole suitability is subject to judicial review, that review is limited, and narrower in scope than appellate review of a lower court's judgment. The "some evidence" standard is intended to guard against arbitrary parole decisions, without

_____

*(footnote continued from previous page)*

It is of course a matter of routine to review the evidence referenced in the parole authority's decision. Because the "some evidence" standard is easily satisfied, that is usually sufficient for the reviewing court's purpose. But we have never *limited* the scope of review to the evidence specified by the parole authority. Indeed, this court has relied on evidence omitted from the decision below to conclude that findings were *not* supported by "some evidence." (See *Lawrence*, *supra*, 44 Cal.4th at pp. 1222-1226; *Rosenkrantz*, *supra*, 29 Cal.4th at pp. 680-681.) It would be a perversion of the deferential "some evidence" standard if a reviewing court were permitted go beyond the evidence mentioned by the parole authority to conclude that a finding lacks evidentiary support, but forbidden from doing so to confirm that a finding is supported by the record.

25

encroaching on the broad authority granted to the Board and the Governor. (*Lawrence*, *supra*, 44 Cal.4th at pp. 1204-1205, 1212; *Rosenkrantz*, *supra*, 29 Cal.4th at pp. 664-665.) When, as in this case, the parole authority declines to give credence to certain evidence, a reviewing court may not interfere unless that determination lacks any rational basis and is merely arbitrary.

B. *Petitioner's Due Process Claims*

Petitioner contends the Board's denial of parole based on his lack of insight deprived him of due process because (1) even if he had denied guilt altogether, he could not be found unsuitable for parole on that basis; (2) "an aging inmate's honest but deteriorating recollection of past events is at best immutable," and therefore "parole would be interminably denied on that basis, converting a sentence for second degree murder to life without the possibility of parole"; and (3) the Board's reasoning would require petitioner to fabricate facts he does not recall in order to obtain parole. These claims have no merit.

Penal Code section 5011, subdivision (b) states: "The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." Petitioner does not deny his guilt, so this provision has no application here. It may be that when a denial of guilt is the *only* evidence of an inmate's lack of insight, and the denial is plausible, parole may not be denied on that basis. (See *In re Jackson* (2011) 193 Cal.App.4th 1376, 1389-1391, discussing cases.) That question is not before us. We note, however, that an *implausible* denial of guilt may support a finding of current dangerousness, without in any sense requiring the inmate to admit guilt as a condition of parole. In such a case it is not the failure to admit guilt that reflects a lack of insight, but the fact that the denial is factually unsupported or otherwise lacking in credibility.

Here, petitioner's lack of insight was established by a variety of factors: the 2004 and 2005 psychological reports discussed in *Shaputis I*, *supra*, 44 Cal.4th

26

at pages 1250-1252; his own statements about the shooting, which failed to account for the facts at the scene or to provide any rational explanation of the killing; his inability to acknowledge or explain his daughter's charge that he had raped her; and his demonstrated failure to come to terms with his long history of domestic violence in any but the most general terms.

Petitioner's contention that his inability to recall the circumstances of the crime is an immutable factor, and that he would be required to engage in fabrication to show insight, finds no support in the record. He did not claim in his written statement that he could not remember the crime. He merely said, "I do not have a vivid recollection of all of my previous conduct." His retained psychologist did not detect any deficit in his memory. To the contrary, Dr. Stark reported that when she interviewed petitioner "[h]is thinking was rational, logical and coherent. . . . He presented as average to above average in functioning. . . . *His memory was intact. Both remote and recent memories were intact.* . . . There were no signs of a thought disorder. *His judgment and insight appeared to be within normal limits.* In general his presentation was sincere and straightforward." (Italics added.) Thus, it does not appear that petitioner's memory presented any obstacle to his ability to demonstrate that he had gained insight into his criminal behavior.

We note as well that, as in *Shaputis I*, the Board's decision was not based solely on petitioner's lack of insight, but also on the nature of the murder and petitioner's long history of domestic violence. (*Shaputis I*, *supra*, 44 Cal.4th at pp. 1259-1260.) Petitioner finds himself incarcerated because of his criminal conduct. That conduct, as well as his level of insight and acceptance of responsibility, remains a crucial aspect of the determination whether he may safely be paroled.

C. *The Insight Factor*

We turn now to broader concerns about the use of an inmate's degree of insight into his or her criminal behavior as a factor in parole suitability determinations. The majority below noted that before we decided *Lawrence* and *Shaputis I*, most parole denials by the Board and the Governor were based on the gravity of the commitment offense. (See *Lawrence*, *supra*, 44 Cal.4th at p. 1206.) After *Lawrence*, which held that the circumstances of the offense justify a denial of parole only if they support the ultimate conclusion that the inmate *continues* to pose an unreasonable risk to public safety (*id.* at p. 1221), and *Shaputis I*, which held that petitioner's failure to gain insight into his antisocial behavior was a factor supporting denial of parole (*Shaputis I*, *supra*, 44 Cal.4th at p. 1260), a great many parole denials have focused on the inmate's lack of insight. Other Courts of Appeal have noted this development. (See, e.g., *In re Rodriguez* (2011) 193 Cal.App.4th 85, 97; *In re Gomez* (2010) 190 Cal.App.4th 1291, 1308; *In re Powell* (2010) 188 Cal.App.4th 1530, 1539.)

Here, the Court of Appeal majority commented that the increased reliance on lack of insight as a factor "is likely attributable to the belief of parole authorities" that it "is more likely than any other factor to induce the courts to affirm the denial of parole." That assertion is inappropriate. While it is not unusual for courts to "struggle[] to strike an appropriate balance between deference to the Board and the Governor and meaningful review of parole decisions" (*Lawrence*, *supra*, 44 Cal.4th at p. 1206), speculation regarding ulterior motives on the part of the parole authorities has no proper place in a judicial opinion. Moreover, it is not unusual for administrative determinations to follow the standards set out in controlling judicial opinions. The *Lawrence* and *Shaputis I* decisions reoriented the focus of parole suitability review, making it clear that the inmate's *current* dangerousness is the crucial determination. We discouraged

28

narrow reliance on the circumstances of the commitment offense, untethered to considerations of the inmate's present risk to public safety, including the inmate's current state of mind. (*Lawrence*, *supra*, 44 Cal.4th at pp. 1219-1221; *Shaputis I*, *supra*, 44 Cal.4th at pp. 1259-1260.) In the wake of those opinions, it is not surprising that the parole authorities have given greater attention to the inmate's degree of insight.

It is the job of a reviewing court to proceed case by case, examining each record and applying the deferential "some evidence" standard to the parole determination before it. Of course judges are not blind to recurring features of the cases that come before them. They may properly be skeptical of stated reasons that appear to be unsupported by the record. Yet considerations of judicial restraint and comity between the executive and judicial branches counsel against including mere suspicions in the court's opinion. (But see *Rosenkrantz*, *supra*, 29 Cal.4th at p. 684 [*admissible evidence* that a parole decision was made in accordance with a blanket policy may properly be considered in determining whether due process was satisfied].)

The majority below also reasoned that "lack of insight" is not among the factors in the regulations governing unsuitability for parole, that it is a more subjective consideration than the regulatory factors, and that "a statement that an inmate 'lacks insight' appears to be stating a conclusion drawn from other evidence rather than being evidence itself." These observations are off the mark. Consideration of an inmate's degree of insight is well within the scope of the parole regulations. The regulations do not use the term "insight," but they direct the Board to consider the inmate's "past and present attitude toward the crime" (Regs., § 2402, subd. (b)) and "the presence of remorse," expressly including indications that the inmate "understands the nature and magnitude of the offense"

29

(Regs., § 2402, subd. (d)(3)).  These factors fit comfortably within the descriptive category of "insight."

In *Lawrence*, we observed that "changes in a prisoner's maturity, understanding, and mental state" are "highly probative . . . of current dangerousness."  (*Lawrence*, *supra*, 44 Cal.4th at p. 1220.)  In *Shaputis I*, we held that this petitioner's failure to "gain insight or understanding into either his violent conduct or his commission of the commitment offense" supported a denial of parole.  (*Shaputis I*, *supra*, 44 Cal.4th at p. 1260.)  Thus, we have expressly recognized that the presence or absence of insight is a significant factor in determining whether there is a "rational nexus" between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety.  (*Lawrence*, at p. 1227; see also *Shaputis I*, at p. 1261, fn. 20.)

We note that the regulatory suitability and unsuitability factors are not intended to function as comprehensive objective standards.  The regulations state that the factors "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel."  (Regs., § 2402, subds. (c) & (d).)  The parole authority is required to consider "all relevant, reliable information" that "bears on the prisoner's suitability for release."  (Regs., § 2402, subd. (b).)  Accordingly, the inmate's insight into not just the commitment offense, but also his or her other antisocial behavior, is a proper consideration.

As for the Court of Appeal majority's comments that insight is a particularly subjective factor, amounting to a conclusion drawn from other evidence, we note that a finding on insight is no more subjective or conclusory than a finding on the inmate's "past and present mental state."  (Regs., § 2402, subd. (b).)  Furthermore, it has long been recognized that a parole suitability decision is an "attempt to predict by subjective analysis whether the inmate will be

30

able to live in society without committing additional antisocial acts." (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 655; see *In re Sturm* (1974) 11 Cal.3d 258, 266.) Past criminal conduct and current attitudes toward that conduct may both be significant predictors of an inmate's future behavior should parole be granted. (*Lawrence*, *supra*, 44 Cal.4th at p. 1213; *Shaputis I*, *supra*, 44 Cal.4th at pp. 1259-1260.)

It bears emphasis that while "subjective analysis" is an inherent aspect of the parole suitability determination, it plays a proper role only in the *parole authority's* determination. (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 655.) The courts' function is one of objective review, limited to ensuring that the Board's or Governor's analysis of the public safety risk entailed in a grant of parole is based on a modicum of evidence, not mere guesswork. (*Lawrence*, *supra*, 44 Cal.4th at p. 1213.) It is the parole authority's duty to conduct an individualized inquiry into the inmate's suitability for parole.[12] (*Lawrence*, at p. 1219.) The courts consider only whether some evidence supports the ultimate conclusion that the inmate poses an unreasonable risk to public safety if released. (*Id*. at p. 1221.)

The majority below correctly observed that lack of insight, like any other parole unsuitability factor, supports a denial of parole only if it is rationally indicative of the inmate's current dangerousness. (*Lawrence*, *supra*, 44 Cal.4th at p. 1210.) However, it is noteworthy that lack of insight pertains to the inmate's current state of mind, unlike the circumstances of the commitment offense, the

---

[12] As we have noted, the insight factor calls for particularly individualized consideration: "expressions of insight and remorse will vary from prisoner to prisoner and . . . there is no special formula for a prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior." (*Shaputis I*, *supra*, 44 Cal.4th at p. 1260, fn. 18.)

31

factor primarily at issue in *Lawrence*. (See *Lawrence*, at p. 1191.) Thus, insight bears more immediately on the ultimate question of the present risk to public safety posed by the inmate's release. Moreover, insight, unlike the circumstances of the offense, may change over time. (See *Lawrence*, at pp. 1218-1220.) Therefore, the most recent evidence of the inmate's degree of insight will usually bear most closely on the parole determination, although as discussed in part II.A., *ante*, this is not necessarily so. This case is an example of the Board's proper reliance on older evidence in the record, and of the disadvantages that may follow from an inmate's decision not to testify at a parole hearing or otherwise cooperate in the development of current information regarding his or her mental state.

Petitioner, in his brief before this court, goes a good deal further than the majority opinion below, and contends that lack of insight plays no proper role in determining suitability for parole. Citing a number of reports in psychological, psychiatric, and criminological journals, he claims that experts disagree on the meaning of a subject's insight, that judgments of insight reached without "empirically validated measures" have no value in predicting recidivism, and that "major studies" have found no relationship between insight into past behavior and future violence. Thus, petitioner asserts that lack of insight can never be deemed "some evidence" that an inmate poses an unreasonable risk to public safety. These arguments fail.

In the first place, it is not a judicial function to weigh conflicting views in the social or psychological sciences for the purpose of developing rules binding on the executive branch. Petitioner's arguments on the efficacy of insight as a predictor of future violence would be more appropriately presented to the Legislature, or to the Board in its rulemaking capacity. (See Pen. Code, §§ 3041, subd. (a) & 3052.) As discussed above, the current parole regulations firmly

32

support consideration of an inmate's insight into his or her criminal behavior as a relevant factor.

These considerations aside, it is difficult to imagine that the Board and the Governor should be required to ignore the inmate's understanding of the crime and the reasons it occurred, or the inmate's insight into other aspects of his or her personal history relating to future criminality. Rational people, in considering the likely behavior of others, or their own future choices, naturally consider past similar circumstances and the reasons for actions taken in those circumstances. Petitioner's argument that the inmate's insight should play no role in parole suitability determinations flies in the face of reason.

D.  *Summary of Principles Governing Review of Parole Decisions*

We are well aware that the Court of Appeal below was not alone in its confusion about the proper scope of review. Uncertainty is reflected in numerous Court of Appeal decisions reviewing parole suitability determinations. Accordingly, we briefly summarize the relevant considerations:

1.  The essential question in deciding whether to grant parole is whether the inmate currently poses a threat to public safety.

2.  That question is posed first to the Board and then to the Governor, who draw their answers from the entire record, including the facts of the offense, the inmate's progress during incarceration, and the insight he or she has achieved into past behavior.

3.  The inmate has a right to decline to participate in psychological evaluation and in the hearing itself. That decision may not be held against the inmate. Equally, however, it may not limit the Board or the Governor in their evaluation of all the evidence.

4.  Judicial review is conducted under the highly deferential "some evidence" standard. The executive decision of the Board or the Governor is

33

upheld unless it is arbitrary or procedurally flawed.  The court reviews the entire record to determine whether a modicum of evidence supports the parole suitability decision.

5.  The reviewing court does not ask whether the inmate is currently dangerous.  That question is reserved for the executive branch.  Rather, the court considers whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness.  The court is not empowered to reweigh the evidence.

## III.  DISPOSITION

We reverse the judgment of the Court of Appeal.


**CORRIGAN, J.**


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**CHIN, J.**

**CONCURRING OPINION BY WERDEGAR, J.**

I concur in the majority opinion, with the exception of footnote 11 on pages 24-25. Because the issue addressed there is not before the court, and the majority's comments are unnecessary to the resolution of the case, I would await a future case specifically posing that issue.

WERDEGAR, J.

1

**CONCURRING OPINION BY CHIN, J.**

I dissented in *In re Lawrence* (2008) 44 Cal.4th 1181 (*Lawrence*).  I believed then, and still believe, the majority opinion in that case was ill-considered.  *Lawrence* is largely responsible for the confusion in the Courts of Appeal that today's opinion seeks to ameliorate.  However, my view in *Lawrence* did not prevail, and I now accept the majority view.  For this reason, I concur entirely in this case.

CHIN, J.

**CONCURRING OPINION BY LIU, J.**

As today's opinion explains, the Court of Appeal was incorrect to conclude that earlier evidence of lack of insight had "evaporated" in light of more recent psychological reports, particularly when petitioner declined to be interviewed by the psychologist appointed by California Department of Corrections and Rehabilitation (CDCR) and to speak to the Board of Parole Hearings (Board) about his commitment offense or his social history. "[A]n inmate who restricts the Board's access to current information is in no position to complain about the Board's reliance on other relevant evidence." (Maj. opn., *ante*, at p. 2.)

The court's opinion today goes beyond this holding in an effort to clarify the "some evidence" standard of review and to provide guidance regarding lack of insight as a suitability factor. The court's commentary on both issues prompts me to offer some additional remarks.

## I. PAROLE DECISIONS AND THE "SOME EVIDENCE" STANDARD

In light of the Court of Appeal's overreaching in this case, today's decision correctly emphasizes that judicial review of Board decisions is deferential: "While the evidence supporting a parole unsuitability finding must be probative of the inmate's current dangerousness, it is not for the reviewing court to decide which evidence in the record is convincing." (Maj. opn., *ante*, at p. 19 [citing *In re Lawrence* (2008) 44 Cal.4th 1181, 1204, 1212 (*Lawrence*)].) As we observed in *Lawrence*, " '[r]esolution of any conflicts in the evidence and the weight to be

1

given the evidence are within the authority of the Board.' " (*Lawrence*, 44 Cal.4th at p. 1204, quoting *In re Rosenkrantz*, 29 Cal.4th 616, 656.)  More broadly, we have explained that judicial review of parole decisions under the "some evidence" standard must be highly deferential so that it does not "impermissibly shift the ultimate discretionary decision of parole suitability from the executive branch to the judicial branch."  (44 Cal.4th at p. 1212.)

The emphasis on judicial deference is part of the court's effort to summarize the principles governing judicial review of parole decisions.  (Maj. opn, *ante*, at pp. 32-33.)  Because today's opinion focuses on the obligations of reviewing courts, I think it useful and complementary to summarize a few principles governing the Board's obligations as well.

As we have repeatedly said, the parole statute and regulations put the onus on the Board to justify denial of parole:  " '[T]he governing statute provides that the Board *must* grant parole *unless* it determines that *public safety* requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction.  (Pen. Code, § 3041, subd. (b).)  And as set forth in the governing regulations, the Board *must* set a parole date for a prisoner unless it finds, in the exercise of its judgment after considering the circumstances enumerated in section 2402 of the regulations, that the prisoner is unsuitable for parole.  Accordingly, parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation.' (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 654, italics added; see also *In re Smith* (2003) 114 Cal.App.4th 343, 366 ['parole is the rule, rather than the exception'].)"  (*Lawrence*, 44 Cal.4th at p. 1204.)

In light of this basic statutory obligation to grant parole unless public safety is at risk, we have held that the Board, as a matter of due process, has a duty to

2

provide "a definitive written statement of its reasons for denying parole." (*In re Sturm* (1974) 11 Cal.3d 258, 272.) The requirement of a definitive written statement of reasons serves two functions. First, it serves to "adequately inform the inmate" of the reasons for the denial (*ibid.*) so that the inmate is given a fair opportunity to make the life changes necessary to be considered suitable for parole in the future. Second, the requirement fulfills the "mandate that a basis for administrative action must be set forth with sufficient clarity as to be understandable" so as "to afford an adequate basis for judicial review." (*Ibid.*) Although the Board is not required to "comprehensively martial the evidentiary support for its reasons" (maj. opn, *ante*, at p. 24, fn. 11), it is required to point to evidence in the record that supports its reasoning. Otherwise, the statement of reasons would be conclusory and would fail to concretely inform the prisoner and the reviewing court of the Board's decisionmaking process.

The Board's obligation to provide a definitive written statement of reasons for denying parole shapes the nature of judicial review. As we said in *Lawrence*, the task of reviewing courts is to "determine whether the facts relied upon by the Board or the Governor support the ultimate decision that the inmate remains a threat to public safety" (*Lawrence*, *supra*, 44 Cal.4th at p. 1213) and specifically to determine whether the Board's or the Governor's decision includes "reasoning establishing a rational nexus" between identified unsuitability factors and current dangerousness (*id.* at p. 1210). In other words, the focus of judicial review is on the rationality of the Board's or the Governor's decision—not only the ultimate conclusion of current dangerousness but also *the evidence and reasoning on which the Board or Governor actually relied* to reach that conclusion.

Today's opinion says that "[t]he court reviews the entire record to determine whether a modicum of evidence supports the parole suitability decision" (maj. opn., *ante*, at p. 33) and that "[o]nly when the evidence reflecting the

3

inmate's present risk to public safety leads to but one conclusion [i.e., nondangerousness] may a court overturn a contrary decision by the Board or the Governor" (*id.* at p. 19). (See also *id.* at p. 24 ["a court must consider the whole record in the light most favorable to the determination before it, to determine whether it discloses some evidence" supporting the denial of parole].) Although these statements properly underscore the deferential nature of judicial review, I do not understand today's opinion to contravene the principle that the reviewing court's primary focus is on the "facts" and "reasoning" relied on by the Board (*Lawrence*, *supra*, 44 Cal.4th at pp. 1210, 1213). If that were not the case, at least three problems would arise.

First, judicial review would not serve to enforce the Board's obligation to provide "a definitive written statement of its reasons for denying parole." (*Sturm*, *supra*, 11 Cal.3d at p. 272.) Second, judicial review would run the risk of "impermissibly shift[ing] the ultimate discretionary decision of parole suitability from the executive branch to the judicial branch." (*Lawrence*, *supra*, 44 Cal.4th at p. 1212.) Third, judicial review would not serve to "ensure that the Board and the Governor have complied with the statutory mandate and have acted within their constitutional authority." (*Id.* at p. 1213.) For how can a court determine whether a parole "decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards" (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 677) unless judicial review focuses on the Board's or the Governor's actual decisionmaking?

Given these concerns, it is no surprise that our consistent practice has been to examine the evidence and reasoning on which the Board or the Governor actually relied. (See, e.g., *Lawrence*, *supra*, 44 Cal.4th at pp. 1221-1227; *In re Shaputis* (2008) 44 Cal.4th 1241, 1258-1260 (*Shaputis I*); *In re Dannenberg* (2005) 34 Cal.4th 1061, 1095; *Rosenkrantz*, *supra*, 29 Cal.4th at pp. 678-683.) In

4

undertaking that inquiry, we have been mindful of the deference owed to the Board's and the Governor's authority. And, as explained in part II below, we have considered the entire record for the purpose of determining whether the evidence on which the Board or the Governor relied rationally supports a finding of current dangerousness in the context of all other evidence that the Board or the Governor is obligated to consider. But reviewing courts have not upheld the parole authority's decision based on evidence substantially different from that on which the authority actually relied.

While the court is correct that "some evidence" review is more deferential than the substantial evidence standard used to review criminal jury verdicts (maj. opn, *ante*, at p. 24.), it is also a more focused form of judicial review. Unlike the Board, a jury is not required to give "a definitive written statement of its reasons" (*Sturm*, *supra*, 11 Cal.3d at p. 272) for a verdict, and the reasons for protecting the sanctity and secrecy of jury deliberations (see, e.g., *People v. Cleveland* (2001) 25 Cal.4th 466, 475) have no applicability to the Board. Given these differences, appellate review of jury verdicts properly examines what evidence and inferences a rational factfinder *could have* relied on, while judicial review of parole decisions properly examines what evidence and inferences the Board *did* rely on. At the same time, a jury verdict must be supported by evidence substantial enough to support a finding of guilt beyond a reasonable doubt, while a parole denial need only be supported by some evidence that is rationally indicative of current dangerousness.

Further, although appellate review of trial court decisions for sufficiency of the evidence "extends to the entire record, and is not limited to facts mentioned in [the] statement of decision" (maj. opn., *ante*, at p. 24, fn.11), that is because what matters to an appellate court is the lower court's *judgment*, i.e., whether its ultimate determination regarding guilt or liability was correct. Judicial review in

5

the parole context examines the *rationality* of the parole authority's decision, an inquiry that properly focuses on the authority's reasoning, including the evidence cited by the authority in support of its reasoning.

## II. LACK OF INSIGHT

As mentioned above, an important dimension of the rationality required of parole decisions is that the Board or the Governor must offer "reasoning establishing a rational nexus" between identified unsuitability factors and current dangerousness. (*Lawrence*, *supra*, 44 Cal.4th at p. 1210.) We applied that requirement in *Lawrence* to hold that the Governor may rely on the circumstances of the commitment offense to establish parole unsuitability "if, and only if, those circumstances are probative of the determination that a prisoner remains a danger to the public." (*Id.* at p. 1212.) We explained that according talismanic significance to the circumstances of the commitment offense or any other unsuitability factor would be "inconsistent with the statutory mandate that the Board and the Governor consider all relevant statutory factors when evaluating an inmate's suitability for parole." (*Id.* at pp. 1191, 1212 ["It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public."].) In *Lawrence*, we invalidated the Governor's decision to deny parole because his reliance on the circumstances of the commitment offense to establish unsuitability lacked any "articulation of a rational nexus between those facts and current dangerousness" in light of the inmate's rehabilitative gains. (*Id.* at p. 1227.)

Today's decision acknowledges that "lack of insight, like any other parole unsuitability factor, supports a denial of parole only if it is rationally indicative of the inmate's current dangerousness." (Maj. opn., *ante*, at p. 30, citing *Lawrence*, 44 Cal.4th at p. 1210.) We do not hold today—nor did we hold in *Shaputis I*,

6

where we first recognized lack of insight as an unsuitability factor (44 Cal.4th at p. 1255)—that some evidence of lack of insight into past criminal behavior necessarily means there is some evidence of current dangerousness. There are good reasons to resist such a holding.

First, as the court acknowledges, older evidence of lack of insight may be eclipsed by more recent evidence: "Usually the record that develops over successive parole hearings has components of the same kind: CDCR reports, psychological evaluations, and the inmate's statements at the hearings. In such cases, the Board or the Governor may not arbitrarily dismiss more recent evidence in favor of older records when assessing the inmate's current dangerousness." (Maj. opn., *ante*, at p. 30.) In *Lawrence*, for example, we rejected the Governor's suggestion that the petitioner continued to pose a danger due to serious psychiatric problems, concluding that the Governor's position was based on earlier, superseded psychological evaluations. (*Lawrence*, *supra*, 44 Cal.4th at pp. 1223-1224.) Courts may properly intervene when the Board or the Governor rely on outdated evidence of lack of insight in denying parole. (See *In re Gomez* (2010) 190 Cal.App.4th 1291, 1308-1309; *In re Twinn* (2010) 190 Cal.App.4th 447, 468-469.)

Second, even recent evidence of lack of insight does not necessarily mean there is some evidence the inmate is currently dangerous. This is most obviously the case when an inmate, due to advanced age and infirmity, is no longer capable of being dangerous, no matter how little insight he has into previous criminal behavior. But even in cases not involving incapacity, our Courts of Appeal have recognized that lack of insight is not invariably linked to current dangerousness.

The term "lack of insight" in the parole context appears to refer broadly to inmates with one of two types of deficiencies: (1) to inmates who deny committing the crime for which they were convicted or deny the official version of

7

the crime; and (2) to inmates who admit their crime but are regarded as having an insufficient understanding of the causes of their criminal conduct.

In the first category, some courts have reversed parole denials that were based solely on the inmate's denial of culpability for the offense. In *In re Palermo* (2009) 171 Cal.App.4th 1096, for example, the inmate maintained that he accidentally shot his former girlfriend, not knowing the gun was loaded, and was only guilty of manslaughter. The state argued that the killing was intentional, and he was convicted of second degree murder. The court, in reversing the Board's denial, noted his record as a model prisoner and the fact that he was consistently remorseful for the shooting, even though he continued to maintain it was accidental. The court also observed that under Penal Code section 5011, subdivision (b), "[t]he Board is precluded from conditioning a prisoner's parole on an admission of guilt." The court reasoned that "defendant's version of the shooting of the victim was not physically impossible and did not strain credulity such that his denial of an intentional killing was delusional, dishonest, or irrational. And, unlike . . . in . . . *Shaputis [I]* . . . , defendant accepted 'full responsibility' for his crime and expressed complete remorse . . . . Under these circumstances, his continuing insistence that the killing was the unintentional result of his foolish conduct (a claim which is not necessarily inconsistent with the evidence) does not support the Board's finding that he remains a danger to public safety." (*Palermo*, *supra*, 171 Cal.App.4th at p. 1112; see also *In re Jackson* (2011) 193 Cal.App.4th 1376, 1391; *In re McDonald* (2010) 189 Cal.App.4th 1008, 1023.)

In other cases, courts have reversed parole denials that were based on an inmate's insufficient understanding of the causes of his or her criminal conduct. In *In re Roderick* (2007) 154 Cal.App.4th 242 (*Roderick*), for example, the inmate was convicted of second degree murder and had an extensive criminal history,

8

partly related to his alcoholism. (*Id.* at pp. 248-251.) His record of rehabilitation was impressive, and a long string of psychological reports concluded that he posed no more danger to the public than the average person. (*Id.* at p. 271.) Yet the reports also found that he lacked any in-depth understanding of the causes of his criminal activity other than recognizing its connection to alcoholism and describing such activity as "stupid." (*Ibid.*) While acknowledging that the inmate's responses "were unsophisticated and lacked analytical depth," the court posed the question "whether his inability to articulate a more insightful explanation as to why he committed multiple crimes [is] some evidence that Roderick poses a danger to public safety?" (*Ibid.*) The court concluded it was not: "Roderick provided a less than incisive explanation for his chronic criminality, but his responses also reflected acceptance of his alcoholism, acknowledgement of responsibility for his crimes, remorse, and shame. Ignoring the unanimous clinical evidence to the contrary presented by trained experts — since 1999 all psychological reports conclude he would pose no more danger to society than the average citizen — the Panel's arbitrary pronouncement that Roderick's limited insight poses an unreasonable risk to public safety cannot be considered some evidence to support a denial of parole." (*Id.* at p. 272; see also *In re Ryner* (2011) 196 Cal.App.4th 533, 548-549 (*Ryner*) [no evidence of current dangerousness in model prisoner notwithstanding comment in the psychological report that his insight into his criminal behavior was "weak"].)

Of course, common sense suggests that lack of insight into past criminal behavior may be probative of current dangerousness, and the court properly rejects petitioner's argument, ostensibly based on social science research, that no such link exists. Although the social science literature does not identify lack of insight per se as one of the predictors of criminal recidivism, the term "lack of insight" as used by the Board and the Governor may encompass a number of attitudes or

9

behaviors associated with criminal recidivism. For example, lack of remorse or failure to accept responsibility for past criminal activity may be indicative of an antisocial, psychopathic personality that is correlated with greater recidivism. (See Andrews and Bonta, The Psychology of Criminal Conduct (2d ed. 1998) 301-306.) At the same time, however, the social science literature does not support a generalization that an inmate's lack of insight into the causes of past criminal activity or failure to admit the official version of the commitment offense is itself a reliable predictor of future dangerousness. (See *id.* at pp. 211-248.) The significance of lack of insight to current dangerousness must be assessed and articulated by the Board or the Governor case by case.

When the Board undertakes this assessment, its conclusion that a life prisoner is currently dangerous and therefore should be denied parole "must be supported by some *evidence*, not merely by a hunch or intuition." (*Lawrence*, *supra*, 44 Cal.4th at p. 1213, italics in original.) In cases where psychological evaluations consistently indicate that an inmate poses a low risk of danger to society, a contrary conclusion must be based on more than a hunch or mere belief that he should gain more insight into his past behavior. The Board must point to evidence from which it is reasonable to infer that the inmate's lack of insight reveals a danger undetected or underestimated in the psychological reports. (See *Roderick*, *supra*, 154 Cal.App.4th at pp. 271-72; cf. *Lawrence*, 44 Cal.4th at pp. 1226-1227 [invalidating parole denial because Governor failed to articulate how circumstances of the commitment offense remained probative of current dangerousness given overwhelming evidence of the inmate's rehabilitation].)

Moreover, the Board may not deny parole simply because the prisoner refuses to admit to the official version of the commitment offense. Such an automatic denial would squarely violate Penal Code section 5011, subdivision (b). An inmate's refusal to admit his or her crime can support parole denial "if, and

10

only if, those circumstances are probative of the determination that a prisoner remains a danger to the public" (*Lawrence*, *supra*, 44 Cal.4th at p. 1212), and it is the Board's responsibility to provide an "articulation of a rational nexus between [the inmate's lack of insight] and current dangerousness" taking into account all other evidence concerning parole suitability or unsuitability (*id.* at p. 1227).

Both this case and *Shaputis I* demonstrate how the Board may satisfy the "rational nexus" requirement. In *Shaputis I*, the most current psychological report prepared in 2005 concluded that petitioner posed a low risk of future violent behavior if he maintained sobriety. (*Shaputis I*, *supra*, 44 Cal.4th at p. 1251.) But other parts of the report called that conclusion into question: "Dr. Silverstein was concerned that petitioner planned to reside with his new wife (with whom he had not previously resided) and observed that his violence tended to be 'confined to his family systems and [it is] difficult to assess how well extinguished his pattern of domestic violence is[,] given that he has been confined for more than 18 years." (*Id.* at p. 1252.) As we further observed: "During the proceedings, the Board referred to Dr. Silverstein's report, noting the report's observation that petitioner found 'inexplicable' his daughters' prior allegations of molestation and domestic violence, that he had a flat affect when discussing these allegations, and that this circumstance could be a sign of the schizoid tendencies noted in some previous evaluations. The Board expressed concerns regarding petitioner's lack of insight into his history of domestic violence and his alcoholism, and voiced the attendant concern that he would present an unreasonable risk of danger to the public and to his new wife." (*Ibid.*) In other words, the Board and subsequently the Governor went behind the report's conclusion that petitioner presented a low risk of violence and found in the body of the report indications that this conclusion understated the risk of violence he posed if released. We held this conclusion reasonable in light of petitioner's historic pattern of domestic violence that had culminated in his

11

wife's murder. (*Id.* at p. 1260.) This holding came nowhere close to generalizing that some evidence of lack of insight is necessarily some evidence of current dangerousness, and our limited holding in the present case likewise offers no support for such a sweeping conclusion.

Ultimately, lack of insight may be indicative of current dangerousness in many cases, and today's decision may be correct that "insight bears more immediately on the ultimate question of the present risk to public safety posed by the inmate's release" than the circumstances of the commitment offense. (Maj. opn., *ante*, at p. 31.) But there is good reason to require the Board to articulate a rational nexus between insight and dangerousness in each case, taking into account all other evidence of suitability or unsuitability. As one Court of Appeal put it, "one always remains vulnerable to a charge that he or she lacks sufficient insight into some aspect of past misconduct even after meaningful self-reflection and expressions of remorse." (*Ryner*, *supra*, 196 Cal.App.4th at p. 548.) It is difficult enough for ordinary law-abiding individuals to fully understand and explain all of one's behaviors and motivations. One can only surmise that achieving such self-understanding is at least as difficult for individuals who have committed violent crimes. Precisely because lack of insight is such a readily available diagnosis, its significance as an indicator of current dangerousness must be rationally articulated under the individual circumstances of each case — lest "lack of insight" become, impermissibly, a new talisman with the potential to render almost all life inmates unsuitable for parole. (See *Lawrence*, 44 Cal.4th at p. 1212 [emphasizing "the statute's directive that the Board *shall normally* set a parole release date ([Pen. Code,] § 3041, subd. (a))"], italics in original.)

LIU, J.

12

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Shaputis

_____

**Unpublished Opinion** XXX NP opn. filed 11/17/10 – 4th Dist., Div.1
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S188655
**Date Filed:** December 29, 2011

_____

**Court:** Superior
**County:** San Diego
**Judge:** Michael T. Smyth

_____

**Counsel:**

Michael Evan Beckman; Law Office of Marc Elliot Grossman and Marc Elliot Grossman for Petitioner Richard Shaputis.

Michael Satris; Daniel Broderick, Federal Defender (Eastern District of California) and Monica Knox, Assistant Federal Defender, as Amici Curiae on behalf of Petitioner Richard Shaputis.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Manuel M. Medeiros, State Solicitor General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca, Julie A. Malone and Charles Chung, Deputy Attorneys General, for Respondents Warden James D. Hartley and the Board of Parole Hearings.

W. Scott Thorpe; Bonnie M. Dumanis, District Attorney (San Diego) and Richard J. Sachs, Deputy District Attorney, for California District Attorneys Association as Amicus Curiae on behalf of Respondents Warden James D. Hartley and the Board of Parole Hearings.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael Evan Beckman
3452 Ocean Park Boulevard, Suite 107
Santa Monica, CA  90405
(310) 394-3138

Julie L. Garland
Assistant Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5500