Filed 10/12/21  In re Bettencourt CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re ROGER A. BETTENCOURT,<br><br>on Habeas Corpus. | H048194<br>(Santa Clara County<br>Super. Ct. No. C1912870) |

Petitioner Roger A. Bettencourt[1] was convicted in 1976 of first degree murder and other crimes.  Bettencourt has been eligible for parole since the early 1980s.  In 2019, the Board of Parole Hearings (Board) denied Bettencourt parole, finding he continued to pose an unreasonable risk to public safety.  Bettencourt filed a petition for writ of habeas corpus challenging the Board's decision.  The trial court granted the petition and ordered the Board to provide him with a new parole hearing.

On appeal, the Attorney General asserts the trial court erred.  The Attorney General contends the trial court applied the wrong legal standard of review to the Board's decision and maintains that this court should reverse the trial court's judgment and uphold the Board's decision because some evidence supports its finding that Bettencourt currently poses a threat to public safety.  Although we agree with the Attorney General that the trial court applied the wrong standard of review, we disagree that some evidence

---

[1] Although the correct spelling of petitioner's name apparently is "Bettencort," we refer to him as "Bettencourt" for consistency with the record, including the February 2019 parole suitability hearing at issue here.

supports the Board's decision.  We therefore affirm the trial court's order remanding the matter for a new parole suitability hearing.

## I.  FACTS AND PROCEDURAL BACKGROUND

A.  *Underlying Crimes*

Bettencourt was 23 years old when he murdered 20-year-old Thomas Mallory in Santa Clara County in 1975.  Bettencourt shot Mallory in the back at close range with a rifle in a shopping mall parking lot.  At that time, Mallory was the boyfriend of Bettencourt's former girlfriend Patricia Campbell, against whom he had committed domestic violence, and who was present at the scene of Mallory's murder.

After murdering Mallory, Bettencourt fled the scene with Campbell in a stolen vehicle and, over the next five days, committed a series of violent offenses in Santa Clara and Monterey counties, including burglary, robbery, and assault with a deadly weapon. In the course of those crimes, Bettencourt tied up and robbed a man in his home, took his car, and got into a shootout with the police, injuring an officer.

In 1976, Bettencourt was convicted of first degree murder (Pen. Code, § 187[2]) in Santa Clara County and was sentenced to seven years to life in prison.  He was also convicted in Monterey County of first degree burglary (§ 459), first degree robbery (§ 211), two counts of assault with a deadly weapon (§ 245, subd. (b)), and vehicle theft (Veh. Code, § 10851).  The five-year terms imposed on the burglary and robbery counts were ordered to be served concurrently with the seven-year-to-life term on the murder count, and the six-month-to-life terms on the assault counts were ordered to be served consecutively to each other but concurrently with the burglary and robbery terms.  The term on the vehicle-theft count was ordered stayed.[3]

_____

[2] Unspecified statutory references are to the Penal Code.
[3] These facts are summarized in this court's prior opinion reversing on procedural grounds a 2011 order granting a petition for writ of habeas corpus. (*In re Bettencourt* (Feb. 6, 2012, H036814) [nonpub. opn.].)

## B. *Prison Performance and Parole Board History*

In its decision at the February 2019 parole suitability hearing, the Board found that Bettencourt's long-term confinement (at the time of the hearing, he had been imprisoned for over 40 years) had changed Bettencourt for the better. Since 2003, Bettencourt has been housed at the California Medical Facility in Vacaville.

At the time of the February 2019 hearing, Bettencourt displayed good behavior and had not been issued a California Department of Corrections and Rehabilitation (CDCR) rules violation report in 17 years. His last violation, in 2002, had been for circumventing mail procedures. Bettencourt was engaged in doing janitorial and hospice work. His file included a positive memorandum from a department of the California Correctional Health Care Services and multiple laudatory "chronos" (Form CDC 128–B), including a February 2018 report from his supervisor at the hospice unit, who noted that Bettencourt had displayed a willingness to help others and helped to diffuse "delicate situations" with "tact and diplomacy."

Bettencourt had gotten married while in prison to "Toni"; the relationship lasted about four years and appears to have ended in 1985, although they divorced in 1994. There is no indication in the record of domestic violence issues related to that marriage. At the time of the February 2019 hearing, he was not romantically involved with anyone. When questioned at the hearing about his future plans, he did not rule out the possibility of dating and having children but generally stated he would rather be a "bachelor." Bettencourt participated in prison in self-help groups. Most recently, as of the time of the hearing, he had participated in groups dealing with violence prevention, controlling anger, Alcoholics Anonymous (AA), and domestic violence prevention.

The February 2019 proceeding was Bettencourt's 23d parole suitability hearing. Bettencourt had last appeared before the Board approximately 18 months earlier, in June 2017. When in 2019 the Board questioned Bettencourt about why he had been denied parole in 2017, Bettencourt responded that it was basically related to "insight" and that he

3

had not being doing what he referred to as "grouping" or "self-help." Since that last hearing, Bettencourt had been attending AA meetings every week.[4]

C. *2018 Comprehensive Risk Assessment*

Prior to the February 2019 parole suitability hearing, a forensic psychologist from the CDCR, Dr. Melissa Marrapese, conducted a comprehensive risk assessment of Bettencourt.[5] Dr. Marrapese issued a report dated October 29, 2018, which the Board considered at the hearing. Her report noted she had met with Bettencourt and reviewed information from various sources, including his central file.

Dr. Marrapese's report contained a summary of Bettencourt's commitment offense taken from this court's 2012 opinion.[6] Specifically, Dr. Marrapese's summary stated: "On November 6th, 1975, Bettencourt killed 20 year old Thomas Mallory by shooting him in the back with a .30–06 rifle in a shopping mall parking lot while Mallory was with Patricia Campbell. Campbell had ended their romantic relationship with Bettencourt a month or so earlier. Following the murder, Bettencourt and Campbell left the scene in a stolen vehicle and over the next five days, they committed additional offenses, including burglary, robbery, and assault with a deadly weapon. They were arrested following a high speed chase that ended in a shootout with pursuing officers."

Dr. Marrapese also referenced prior assessments and diagnoses of Bettencourt, including the last comprehensive risk assessment conducted by another psychologist, Dr. Charles Taylor, in 2015, who had diagnosed Bettencourt with antisocial personality

---

[4] At the 2019 hearing, the Board found Bettencourt did not have a substance abuse problem.

[5] Bettencourt also submitted to the Board a report from a clinical and forensic psychologist (Dr. Francesca Lehman) dated November 1, 2018, which was prepared for his attorney. The Board did not discuss this report at the hearing and appeared to give it little to no weight. We do not reweigh that implicit finding. (See *In re Shaputis* (2011) 53 Cal.4th 192, 212 (*Shaputis II*) ["Nor was it arbitrary for the Board to doubt the credibility of the documentary evidence submitted by petitioner."].)

[6] See fn. 3, *ante*.

4

disorder, with narcissistic traits. In his report, Dr. Taylor noted improvement by Bettencourt and estimated his risk level as low. Additionally, Dr. Marrapese referred to a 2011 psychological assessment authored by Dr. Taylor, which had estimated his risk level to be "moderate."

Dr. Marrapese discussed Bettencourt's reflections on the life crime and death of Thomas Mallory. In her view, Bettencourt "was involved in a love triangle" and "his anger and jealousy exploded in the death of the victim." Dr. Marrapese stated Bettencourt had a "realistic appraisal of his behavior around the time of the life crime" based on his statements about his "selfishness, lack of patience, controlling behavior and difficulties managing impulses."

Dr. Marrapese noted: "Today, he was asked if he continued to feel anger towards [Campbell], or the victim, which he denied. However, while this may be true, he demonstrated a slight proclivity to subtly blame [Campbell] for his behavior." She also observed that this "externalization of emotion has been noted in past evaluations." She noted that Bettencourt did not have a history of a major mental illness and "has not reacted with violence in recent years." She further observed that Bettencourt has continued "to work towards addressing underlying dynamics that led to the crime, yet continues to struggle [to] identify personality traits, and how these traits may pose future problems if [he] were again to become involved in a significant romantic relationship."

Dr. Marrapese stated that "[o]ver the years, records do indicate Mr. Bettencourt has devoted time and energy to exploring past attitudes and beliefs that contributed to the life crime" and that there had been, in the past, a concern about "a tendency to minimize and externalize blame." She stated: "Today, improvement is noted, although there is an underlying tendency to blame (externalize) others for his actions and he continues to have difficulty identifying the negative aspects of his personality that led to this predicament."

Overall, Dr. Marrapese opined that, if granted parole supervision, Bettencourt represented a low risk for violence. Specifically, she found he "presents with non-

5

elevated risk relative to long-term inmates and other parolees" and was "expected to commit violence much less frequently than all other parolees."

D. *2019 Parole Suitability Hearing*

The parole suitability hearing took place on February 27, 2019, before a two-member panel. At the time of the hearing, Bettencourt was 66 years old, had been in custody for approximately 43 years, and had had 22 prior parole suitability hearings.

At the hearing, Bettencourt spoke at length on a variety of topics, including the murder and ensuing series of crimes, his history, and his plans for release. Bettencourt stated he had been bullied in his youth and that his parents had fought frequently, divorcing when he was around 16 years old. When he was 12 or 13 years old, he started hanging around older men in their twenties, although he was not in a gang. He was sent to the California Youth Authority for petty theft.

In 1971, when he was 19, Bettencourt was imprisoned for four years in Soledad for first degree burglary. Bettencourt noted that "[b]ack then I used to steal all the time" and he had tried to burglarize a pawn shop and held the owner of the store hostage with a gun. The gun went off and almost shot the owner.

In approximately late 1974, while he was imprisoned at Soledad and was about 22 years old, he met Campbell through some friends; she was then 18. She would visit him on weekends, and they developed a romantic relationship. About a year into their relationship, Bettencourt recalled they planned to get married. At the time, he was "feeling good about life" and wanted to change for the better. In his view, Campbell was different than other girls he had known, including because she worked part-time, went to college, and was independent, and he was in love and "obsessed over her."

In September 1975, Bettencourt was released from prison on parole. Campbell came to pick him up, and they spent the first week together seeing his family. They decided to move to Santa Clara County where Campbell lived.

6

Approximately a month after his release from prison, Campbell told Bettencourt she was having an affair with someone named "Ron." Bettencourt noted he "immediately blew it and shoved [Campbell] real hard, and I broke her jaw." He took her to the hospital and later went to her mother's house to try to see Campbell and offered to help pay for the hospital bill; he was very upset and still wanted to try to save the relationship. He acknowledged at the 2019 parole hearing that he had stalked Campbell following the violent incident. They remained in contact and traveled to Merced County together; he was arrested there (apparently on kidnapping charges after her parents alerted authorities) and jailed for seven days. In retrospect, he agreed he might have kidnapped Campbell though at the time he viewed her as going willingly with him.

In the days prior to Mallory's murder, Bettencourt wanted to kill Campbell and then commit suicide; he stole two guns, including a 30.06 rifle. He did not then know Mallory was involved with Campbell. In violation of his parole condition, Bettencourt returned to Santa Clara County and learned from some people there that the person with whom Campbell had been having an affair was Mallory, not Ron.

Bettencourt stalked Campbell and followed her from her workplace at the Pruneyard to the Valley Fair Shopping Center, where Mallory worked. He watched her and then parked in a spot where he "couldn't really be seen" in a "shadow spot." He saw her come out with Mallory and confronted them with the 30.06 rifle. Mallory raised his hands. Although it was not part of his original plan, Bettencourt decided at that moment to shoot Mallory. He shot Mallory and fled the scene.

Bettencourt acknowledged that he intended to kill Mallory when he shouldered his rifle and pointed it at him. Bettencourt explained that he was angry at the time and was caught up "in this state of mind of drama."

The Board questioned Bettencourt about his shootout with the police shortly before his arrest. Bettencourt stated he had not intended to kill any police officers but was trying to commit "suicide by cop." Bettencourt denied using Campbell as a human

7

shield during the police shootout. According to Bettencourt, he "wanted her to get out of the car for a minute so I could let them know that she was with me" and he "told her to get back in the car." A deputy district attorney read into the record a probation report from Monterey County that discussed his shootout with the police and noted that Bettencourt held Campbell "in front of him and used her as a shield."

The critical evidence of Bettencourt's current mental state relied upon by the Board in finding Bettencourt not suitable for parole occurred in exchanges between the Board's presiding commissioner and Bettencourt, excerpted below. One exchange occurred in the course of discussing Bettencourt's abuse of Campbell before the murder when he broke her jaw. Bettencourt explained that he shoved Campbell because he had normalized that type of behavior after seeing the domestic violence between his mother and father and the older guys with whom he associated. He stated he "felt that was the way women were treated back then" and "the man wore the britches and I became the same way." The following exchange then occurred:

"[COMMISSIONER]: Did your dad go murder that guy that your mom was sleeping with?

"[BETTENCOURT]: Nay.

"[COMMISSIONER]: How come?

"[BETTENCOURT]: He just - - they would have [to] deal with it better than I did.

"[COMMISSIONER]: So - - so now you see that this was all about domestic violence with you and [Campbell]?

"[BETTENCOURT]: Yeah, I see it. At first, I was in denial thinking, 'Well I ain't never touched a woman in my life until I struck [Campbell]. And, uh, but, uh, I learned that, uh, you know, that just striking a woman once is, uh, one too many. It puts me in the domestic violence category, which I agreed with.

8

"[COMMISSIONER]: What [could] [Campbell] have done so – so – so this crime would never have occurred?

"[BETTENCOURT]: If she would've done?

"[COMMISSIONER]: What could she have done?

"[BETTENCOURT]: Well, like I said, if I had – just talk to me and, you know, tell me why she did it and, you know.

"[COMMISSIONER]: Well, you were there talking. Did you ask her why she did it?

"[BETTENCOURT]: Well she never really gave me any answers. The – the times that I seen her, she was always in the denial of saying, I need time to think. You know, I – I still love and so I – it led me on in the feeling that I still had hope, which is why I – I would pop up again, you know, I figured, you know, things will be all right. And we can just get back on track and continue on with our lives, you know. But uh - -."

Bettencourt later testified that it had not occurred to him that Campbell was afraid of him but "now when I looked back at it" his group work caused him to "realize that I could see why [] she could be scared of me." He believed she was first scared of him when he broke her jaw. But, at the time of the incident and leading up to the murder, he was not aware she was afraid. He had subsequently discussed him breaking her jaw (and a "whole bunch of other issues") in the self-help groups. Looking back on the events now, he did view Campbell being scared of him as a form of domestic violence; he recognized her fear as that which occurs when a woman feels trapped and connected that feeling to how his own mother might have also felt.

Later in the hearing, the presiding commissioner and Bettencourt discussed Bettencourt's confrontation with Mallory and Campbell in the shopping mall parking lot and his murder of Mallory, which included the following exchange:

"[COMMISSIONER]: Well, okay. So what could [Mallory] have said where you wouldn't have killed him? Just like before, what could [Campbell] have done so you

9

wouldn't have broken her jaw or did this whole thing.  What could [Mallory] have said, so you wouldn't have killed him?

"[BETTENCOURT]:  You mean at that moment?

"[COMMISSIONER]:  Uh, yeah, that's the moment.

"[BETTENCOURT]:  Be honest upfront and what, you know, be honest.  Tell me, uh, he had an affair with her and all of this, you know.  Just man up to what he was saying.

"[COMMISSIONER]:  What was it, was he denying it?  What was he saying?

"[BETTENCOURT]:  He wasn't saying nothing.  I just finished saying it the whole time.  He wouldn't, you know - -

"[COMMISSIONER]:  Have you ever heard the word emotional intelligence before?

"[BETTENCOURT]:  Emotional - -

"[COMMISSIONER]:  Emotional intelligence.

"[BETTENCOURT]:  I didn't have none at the time.

"[COMMISSIONER]:  Right, okay.  Right.  Have you heard that saying before, heard that?

"[BETTENCOURT]:  No, I never heard of it.

"[COMMISSIONER]:  I mean, you need to understand, and I - - do - - do you now with that, you know, you have a 30.06 rifle and I didn't even know it had a scope on it and you're telling some gal to get in the car.  What is he supposed to man up to when you have this rifle?  He's scared for his life.  Is his best move to say, 'Yeah I've been sleeping with her,' so you can put a bullet in his head?  Or is it - - or is his best move to sit there and, 'Hey, easy guy,' you know, or whatever he would denying, I mean - - don't you see the monster that you are this time?

"[BETTENCOURT]:  I recognize I'm a monster and I'm able to say I lived [a] monstrous life.  I own up to everything I ever did wrong.

10

"[COMMISSIONER]: Do you think that [if] he'd had said, 'Yeah, I'm sleeping with the - - I'm sleeping with her.' That you [would have] said, 'Oh, okay good. I just want to confirm that?

"[BETTENCOURT]: Nay.

"[COMMISSIONER]: I can go [to] murder suicide now.

"[BETTENCOURT]: Because of my state of mind I don't think [I] would probably even would[n't] been able to, uh, even if he manned up, you know.

"[COMMISSIONER]: Right."

Later in the hearing, the presiding commissioner returned to the topic of domestic violence and asked Bettencourt whether he viewed Campbell as a "willing accomplice" in the post-murder crimes (such as the robbery and burglary) and what Bettencourt thought of her perspective. Bettencourt acknowledged he had not thought about Campbell's feelings at the time and whether she was fearful. However, Bettencourt stated that, at the time of the hearing (i.e., "now"), he had a "clear state of mind" and, with the help of having participated in self-help groups, he was able to look at the "whole overall picture" and see that "I'm responsible for her behavior as well as my own behavior." He could see how him having a gun and her having seen a guy get killed "could scare the shit out of her." The commissioner then asked if he had intercourse with her when they were on the run and Bettencourt stated no, because he was "just too messed up in the mind to think about, uh, sex" and he was "too mad at her."

After counsel delivered closing remarks, Bettencourt addressed the panel at length and further discussed what he had learned from self-help groups about how to manage his anger. The deputy district attorney concluded the hearing by noting Mallory's brother (who had been at a prior hearing but was unable to attend the hearing in February 2019) opposed Bettencourt's release.

11

E.  *Board Decision to Deny Parole*

After a brief recess for deliberation, the Board pronounced its decision and found Bettencourt ineligible for parole for a period of three years.  The Board stated it had read and considered the written record, which included the comprehensive risk assessment done by Dr. Marrapese.  The Board stated it had also considered Bettencourt's testimony, the input of his counsel and the Santa Clara County District Attorney, and the brief statement by the murder victim's brother that the deputy district attorney had entered into the record.

The Board noted that Bettencourt qualified as a youthful offender under section 3051.  Pursuant to that statute, the Board stated it "gave great weight" to that fact that Bettencourt committed the crime as a youth "with the diminished culpability as compared to that of an adult" and asserted it was "taking into consideration" several factors, such as the "development, psychology and brain science" related to adolescents and noted that "parts of the brain involved in behavior control continue to mature through late adolescence."  The Board observed "[a]dolescent brains are not yet fully mature in regions and systems related to higher order functions, which is impulse control, planning ahead and risk avoidance," and this factor related to Bettencourt's "immature thinking."

The presiding commissioner stated several positive findings in favor of finding Bettencourt suitable for parole.  The Board found Bettencourt had realistic plans for his release and had family support.  The Board further concluded that he had taken "full responsibility" for the murder.  The commissioner noted that he had not had a rules violation report for almost two decades and was contributing in a positive manner to the prison and had shown "growth, maturity and rehabilitation during incarceration, relative [to] the prisoner[']s age [at] the time of the crime, the age at the time of the parole suitability hearings."  The commissioner also noted that he believed Bettencourt's current hospice work reflected that Bettencourt had a "self-recognition of human worth and potential."

12

The Board also asserted it considered his elderly parole status, and the presiding commissioner further found Bettencourt was "now of an age that reduces the probability of recidivism."

Nevertheless, the presiding commissioner concluded Bettencourt still posed an unreasonable risk to public safety and therefore was not suitable for parole. Specifically, the commissioner noted the brutality of the murder, including that Bettencourt shot Mallory with a rifle at close range. The commissioner stated that Bettencourt had been "extremely [] obsessed" with Campbell. The commissioner also highlighted the post-murder crimes committed by Bettencourt, when he took Campbell with him, including Bettencourt tying up and robbing a man and later injuring an officer in the police shootout. The commissioner further noted Bettencourt possessed a previous record of violence, including taking a pawn shop owner hostage.

The commissioner observed that the prior criminality and commitment offense were immutable circumstances and that, under California Supreme Court precedent, it needed to consider "whether any other circumstances coupled with the immutable circumstances" supported a conclusion that Bettencourt posed a continued risk to public safety. The commissioner found there were other circumstances in the form of lack of insight and what the Board saw as "blaming or rationalizing or [making] excuses." The presiding commissioner noted that the panel's "number one concern" was that it was not convinced Bettencourt could "see yourself how other people saw you at that time."

More specifically, the presiding commissioner pointed to the conversations quoted above, where he had questioned Bettencourt about what either Campbell or Mallory could have said differently to prevent the crimes. The commissioner noted he had asked Bettencourt about what Campbell could have said to keep Bettencourt from breaking her jaw, and that "you really weren't able to give any additional information." Turning to when Bettencourt shot Mallory, the presiding commissioner appeared to reference the earlier questioning at the hearing about what Mallory could have said to avoid getting

13

shot. In the commissioner's view, Bettencourt's response to that question demonstrated he was trying to rationalize or excuse his behavior and that he did not seemingly understand what a violent man he was at that time. The commissioner therefore was concerned Bettencourt's thinking had not changed, even though his actions had changed. "If you're thinking hasn't changed, you weren't seeing yourself how other people see you then, then that's not going to work." The commissioner also observed that Bettencourt had not demonstrated an understanding "from the police's perspective" during his fire fight with the police.

The deputy commissioner agreed with the presiding commissioner's overall assessment that Bettencourt remained unsuitable for parole. Additionally, the deputy commissioner addressed the recent report from the CDCR psychologist, Dr. Marrapese, which had found Bettencourt at low risk of violence. Generally, the deputy commissioner disagreed (as did the presiding commissioner) with some of Dr. Marrapese's observations in her risk assessment. The deputy commissioner stated that "it's not clear that Dr. Marrapese had a full idea of the incredible violence, the magnitude, the duration, the predaceous[,] the multiple victims" because her report included only a "very short little summary" of Bettencourt's criminality. The deputy commissioner observed Dr. Marrapese "may well have had that in mind and just didn't feel the need to document[] any further." The deputy commissioner focused on the "many days of violent criminality and people either dying or being in fear of their lives," including the time Campbell spent with Bettencourt following the murder where Campbell "must have been in [] deathly fear [for] her life every single minute," and stating "I don't see any appreciation of that on your part."

Furthermore, the deputy commissioner disagreed with Dr. Marrapese's reference to Bettencourt having acted on impulse, because, in the commissioner's view, Bettencourt had not acted impulsively but rather had conducted a "planned ambush." On the other hand, the commissioner acknowledged Bettencourt had been "fueled by

14

emotions" and, referring to Bettencourt's overall criminality, noted the "domestic violence aspect, the vengeance, apparently the, uh, machoism, the wanton disregard for other people's rights and welfare, the impulsiveness, the entitlement, all those things coming to play in this series of criminality." In the commissioner's mind, "[e]very indication is that this was a planned ambush" and the commissioner was not convinced "impulse really captures the thing." The commissioner further emphasized that the doctor appeared to have focused only on the murder victim rather than the other individuals victimized by Bettencourt, stating: "it's almost as though she just wasn't pondering the numerous victims." The Board concluded that Bettencourt posed an unreasonable risk to public safety if he were released from prison and therefore determined he was ineligible for parole.

F. *Habeas Corpus Proceedings and March 20, 2020 Trial Court Order*

On July 2, 2019, Bettencourt filed a petition for writ of habeas corpus in the trial court challenging the denial of parole. He attached to his petition various documents including the 1976 memorandum of decision of his murder conviction and a transcript of the February 2019 hearing.

The trial court issued an order to show cause on September 27, 2019, noting that Bettencourt qualified as both a youthful offender and elderly offender and it did not appear that the Board properly applied the pertinent statutes, stating in part: "Instead the Board appears to have faulted Bettencourt for not putting himself in other persons' shoes and for not articulating his insight to their subjective satisfaction." The trial court appointed counsel for Bettencourt.

The Attorney General filed his return in December 2019. The Attorney General argued, inter alia, that Bettencourt's petition had failed to raise the claim that the Board did not consider his youth offender factors and therefore the trial court had no authority to consider that claim. The Attorney General attached various exhibits, including the

15

underlying abstracts of judgment for Bettencourt's convictions in Santa Clara and Monterey counties and a transcript of the February 2019 hearing.

Following the filing of the return, Bettencourt, through his appointed counsel, sought leave from the trial court to amend his original petition to include the argument that the Board acted arbitrarily and capriciously when it failed to give great weight to the youth offender parole factors as required by section 4801, subdivision (c). The trial court granted the amendment. Bettencourt filed a traverse to the return.

By order filed on March 20, 2020, the trial court granted Bettencourt's petition and ordered a new parole hearing. The trial court referenced its prior reasoning in its September 2019 order to show cause, stating that, as noted in that order, Bettencourt's status as a youthful offender "should have been the Board's central consideration in light of the explanations and findings made by his sentencing judge in his 1976 Memorandum of Decision."

Regarding the pertinent legal principles and standard, the trial court discussed section 3051, which required consideration of Bettencourt's youth at the time of the murder, and also examined a series of cases from the United States Supreme Court generally holding that "a juvenile cannot be given a sentence of life without the possibility of parole (LWOP)." In the trial court's view, the applicable legal standard was that "one must not be denied parole at his parole hearing 43 years after the crime, effectively being subjected to LWOP, unless he is the 'rare juvenile' who is 'irreperabl[y] corrupt[],' 'irretrievabl[y] deprav[ed],' and 'permanent[ly] incorrigibl[e].' " The trial court ruled the Board erred because it clearly did not consider or apply that standard, which, as applied to Bettencourt, compelled a parole grant.

In addition, the trial court disagreed with the Board's finding that Bettencourt lacked insight into his crimes. In the trial court's view, Bettencourt had demonstrated the requisite insight. The trial court viewed the Board's conclusion that Bettencourt lacked insight as flawed. The trial court noted, for example, the Board "did not identify a

16

specific deficiency, which is still relevant today, based on a nexus to the life crime" and "[i]nstead, the Board parsed Petitioner's responses and either neglected to follow up on issues or cut Petitioner's explanations short." The trial court also listed three additional defects in the Board's reasoning: (1) the Board "confused 'insight' with legitimacy," (2) the Board "turned Petitioner's demonstration of insight against him by asserting he was 'blaming or rationalizing or [making] excuses,' " and (3) "given the above nuances, the Board was demanding more of Petitioner than he was legitimately capable of giving" given his level of education. The trial court vacated the Board's parole denial and directed the Board to provide petitioner with "another hearing, comporting with due process, within 120 days. (See *In re Prather* (2010) 50 Cal.4th 238, 244.)"

The Attorney General filed a notice of appeal of the trial court's March 20, 2020 order and a petition for writ of supersedeas requesting a stay of the order. This court granted the petition for writ of supersedeas to stay, pending this appeal, enforcement of the trial court's March 20, 2020 order.

## II. DISCUSSION

The Attorney General contends the trial court applied the wrong legal standard of review to the Board's decision. To assess this claim, we first review the standards governing the Board's parole suitability decision and judicial review of that decision. We then consider whether the Board's decision complied with the statutory and regulatory scheme and pertinent California Supreme Court precedent.

A. *Statutory and Regulatory Scheme*

Section 3041 and California Code of Regulations (Cal. Code Regs., tits. 15, 16, § 2230 et seq.) (hereafter regulations) govern the Board's parole decisions. Pursuant to statute (§ 3041, subd. (b)), "a release date must be set 'unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the *public safety* requires a more lengthy period of incarceration for this individual, and that a parole

17

date, therefore, cannot be fixed at this meeting.' " (*In re Lawrence* (2008) 44 Cal.4th 1181, 1202 (*Lawrence*).)

The Board's "paramount consideration" in making release determinations is "whether the inmate currently poses a threat to public safety." (*Lawrence*, *supra*, 44 Cal.4th at p. 1210; accord *In re Palmer* (2021) 10 Cal.5th 959, 970.) "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a).)

Under the regulations, the Board must consider a variety of factors that govern a prisoner's suitability and unsuitability for parole. (Cal. Code Regs., tit. 15, § 2402, subds. (b)–(d).) The nature of the commitment offense may be one of the circumstances tending to show unsuitability for parole, specifically if the "prisoner committed the offense in an especially heinous, atrocious or cruel manner." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).)

When finding an inmate unsuitable for parole, the Board may not merely recite the facts and circumstances of the commitment offense. (*Lawrence*, *supra*, 44 Cal.4th at p. 1227.) Further, "evidence suggesting a commitment offense was 'especially heinous' or 'particularly egregious' [does not] eternally provide adequate support for a decision that an inmate is unsuitable for parole." (*Id*. at p. 1226.) Rather, there must be a "rational nexus between those facts and *current dangerousness*." (*Id*. at p. 1227, italics added.)

Nevertheless, "[i]n some cases, such as those in which the inmate has failed to make efforts toward rehabilitation, has continued to engage in criminal conduct postincarceration, or has shown a lack of insight or remorse, the aggravated circumstances of the commitment offense may well continue to provide 'some evidence' of current dangerousness even decades after commission of the offense." (*Lawrence*, *supra*, 44 Cal.4th at p. 1228.) An inmate's lack of or degree of insight about the

18

commitment offense and his other antisocial behavior is a proper factor for the Board to consider. (*Shaputis II*, *supra*, 53 Cal.4th at pp. 218–219.) We discuss this "insight factor" (*id.* at p. 219, fn. 12) further below.

Recent statutory changes regarding youth offenders (§ 3051 and § 4801, subd. (c)) and elderly inmates (§ 3055) also apply to the Board's consideration of Bettencourt's parole. Regarding youth offenders, at the time of the 2019 parole suitability hearing, section 3051 and section 4801, subdivision (c), provided for youth offender parole hearings for those who committed their controlling offenses before 25 years of age, such as Bettencourt. (Stats. 2017, ch. 675, §§ 1, 2; *In re Poole* (2018) 24 Cal.App.5th 965, 981, fn. 6 (*Poole*).)[7] The Legislature has amended section 3051 in multiple ways and generally has expanded its scope from juveniles to young adults based on scientific evidence regarding brain development. (See *People v. Acosta* (2021) 60 Cal.App.5th 769, 776 (reviewing section 3051's purpose and history and explaining the Legislature "expanded section 3051's provisions on who is eligible for a youth offender parole hearing, 'recogniz[ing] that the maturity process does not end at 18 and in many cases extends to at least 25 years of age.' "].) The legislative history to the amendment that increased the age limit for the youth offender provisions from 23 to 25 years explained that the change was done to align public policy with scientific research on brain development, particularly scientific evidence showing "certain areas of the brain,

---

[7] Section 3051 and section 4801, subdivision (c), took effect on January 1, 2014. (See *People v. Franklin* (2016) 63 Cal.4th 261, 276 ["[T]he Legislature passed Senate Bill No. 260, which became effective January 1, 2014, and added sections 3051, 3046, subdivision (c), and 4801, subdivision (c) to the Penal Code."].) As originally enacted, section 3051 applied the youth offender parole scheme to juvenile offenders who were under 18 years old when they committed their offense. "In 2015, the Legislature expanded section 3051 to apply to offenders who committed crimes at the age of 23 or younger." (*People v. Acosta* (2021) 60 Cal.App.5th 769, 776.) In 2017, the Legislature "increased the age from 23 to 25, such that offenders serving a determinate or life sentence for crimes committed when they were 25 or younger are now eligible for a youth offender parole hearing." (*Id.* at p. 777.)

19

particularly those affecting judgment and decision-making, do not develop until the early-to-mid 20s.' " (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1308 (2017-2018 Reg. Sess.) as amended March 30, 2017, p. 2.)[8] Pursuant to Section 4801, subdivision (c), the board "*shall give great weight* to the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, italics added.)

Bettencourt, who was 66 years old at the time of the hearing, is also an elderly inmate. Regarding elderly inmates, the Legislature codified, in 2018, the elderly parole program in section 3055. (Stats. 2017, ch. 676, § 3 (Assem. Bill No. 1448 (2017 Reg. Sess.).) "Its 'main purpose was to curb rising medical costs of the geriatric inmate population and to provide a "compassionate" release for those elderly individuals.' " (*In re Hoze* (2021) 61 Cal.App.5th 309, 314.) "When considering the release of an inmate, the Board gives special consideration to 'whether age, time served, and diminished physical condition, if any, have reduced the elderly inmate's risk for future violence.' (§ 3055, subd. (c).)" (*Ibid.*)

B. *Judicial Review of the Parole Board's Decision*

The Attorney General contends the trial court applied the wrong standard of review by analyzing the Board's decision under Eighth Amendment principles rather than a due process rubric. The Attorney General asserts the correct legal standard is whether " 'some evidence' " (see *Shaputis II*, *supra*, 53 Cal.4th at p. 220) supports the Board's

---

[8] The Board adopted final regulations governing youth offender parole hearings, which took effect on January 1, 2020. (Cal. Code Regs., tit. 15, § 2446.) Those regulations were not in effect when the Board held the parole hearing at issue in this matter (in February 2019). We note generally the regulations list circumstances relevant to the youth factors, including that the hallmark features of youth include immaturity and "[i]mpulsivity or impetuosity." (Cal. Code Regs., tit. 15, § 2446.)

determination that Bettencourt poses a current unreasonable risk to public safety. We agree with the Attorney General that the trial court applied the wrong standard of review.

On appeal, Bettencourt appears to generally agree that the " 'some evidence' " standard is the proper standard of review, arguing primarily that the trial court's order should be affirmed because the Board's decision does not satisfy this standard. However, Bettencourt also advances a more demanding standard of review that requires substantial evidence, rather than some evidence, to support the Board's decision. (See *In re Stevenson* (2013) 213 Cal.App.4th 841, 866 [noting that "[t]he 'some evidence' standard of review does not equate to the more demanding 'substantial evidence' standard of review"].) Alternatively, Bettencourt urges us to adopt the trial court's even "more stringent" standard of review requiring the evidence to show an individual is a rare juvenile who is irreparably corrupt.

We decline to apply these novel standards. As the Attorney General points out, the Legislature, in enacting section 3051 and related changes to the Penal Code, found and declared in part that it intended to "create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established" but that "[n]othing in this act is intended to undermine the California Supreme Court's holdings in *In re Shaputis* [*II*, *supra*,] 53 Cal.4th 192, *In re Lawrence* (2008) 44 Cal.4th 1181, and subsequent cases." (Stats. 2013, ch. 312, § 1, p. 2.) In *Shaputis II*, the California Supreme Court explained that "the deferential character of the 'some evidence' standard for reviewing parole suitability determinations" (*Shaputis II*, *supra*, 53 Cal.4th at p. 198) "is meant to serve the interests of due process by guarding against arbitrary or capricious parole decisions, without overriding or controlling the exercise of executive discretion." (*Id*. at p. 199.)

Given these interests and the undisputed evidence of legislative intent to maintain the prior holdings of the California Supreme Court, we decline to depart from the familiar " ' "some evidence" ' " standard. (See *Poole*, *supra*, 24 Cal.App.5th at p. 972.) Under

this standard of review, "the parole authority's interpretation of the evidence must be upheld if it is reasonable, in the sense that it is not arbitrary, and reflects due consideration of the relevant factors." (*Shaputis II*, *supra*, 53 Cal.4th at p. 212.) "It is settled that under the 'some evidence' standard, '[o]nly a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of [the Board or] the Governor. . . . [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of [the Board or] the Governor. . . . It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the . . . decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the . . . decision.' " (*Id*. at p. 210.) But the Board's decision must be supported by "some *evidence*, not merely by a hunch or intuition." (*Lawrence*, *supra*, 44 Cal.4th at p. 1213.)

With these principles in mind, we turn to Bettencourt's claim that the Board's decision was unsupported by any evidence and therefore violated his due process rights.

C. *Application of the Some Evidence Standard to the Board's Decision*

In concluding Bettencourt currently posed an unreasonable risk of danger to society if released from prison, the Board relied on the atrocious and brutal nature of his crimes and its perceived shortcoming in his insight and his "blaming or rationalizing" or making "excuses."

Regarding the insight factor, the California Supreme Court in *Shaputis II* set forth general guidance to the lower courts "on inmates' lack of insight as a parole unsuitability factor," noting that "lack of insight has played an increasingly prominent part in parole decisions and the ensuing habeas corpus proceedings." (*Shaputis II*, *supra*, 53 Cal.4th at p. 200.) While "the regulations do not use the term 'insight,' " the court held that the

22

"descriptive category of 'insight' " was "well within the scope of the parole regulations" and encompassed factors set forth in those regulations, specifically regulations directing "the Board to consider the inmate's 'past and present attitude toward the crime' ([Cal. Code] Regs., [tit. 15,] § 2402, subd. (b)) and 'the presence of remorse,' expressly including indications that the inmate 'understands the nature and magnitude of the offense' ([Cal. Code] Regs., [tit. 15,] § 2402, subd. (d)(3))." (*Id.* at p. 218.)  The court observed that "the insight factor calls for particularly individualized consideration: 'expressions of insight and remorse will vary from prisoner to prisoner and . . . there is no special formula for a prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior.' " (*Id.* at p. 219, fn. 12.)  The court reaffirmed that the "essential question in deciding whether to grant parole is whether the inmate currently poses a threat to public safety" (*Id.* at p. 220) and "[t]hat question is posed first to the Board and then to the Governor, who draw their answers from the entire record, including the facts of the offense, the inmate's progress during incarceration, and *the insight he or she has achieved into past behavior.*" (*Id.* at p. 221, italics added.)

"The term 'lack of insight' in the parole context appears to refer broadly to inmates with one of two types of deficiencies:  (1) to inmates who deny committing the crime for which they were convicted or deny the official version of the crime; and (2) to inmates who admit their crime but are regarded as having an insufficient understanding of the causes of their criminal conduct." (*Shaputis II*, *supra*, 53 Cal.4th at p. 226, conc. opn. of Liu, J.)  The Board here appears to have concluded that Bettencourt falls in the latter category.  However, we do not agree that the findings by the Board are supported either by the record before it or by case law.  Our independent research has not identified any case upholding the denial of parole solely because an inmate was unable to display emotional intelligence or to "see" himself or herself through the victims' eyes, and the Attorney General likewise cites no such authority.

23

In its decision denying Bettencourt parole, the Board ultimately concluded Bettencourt was "blaming or rationalizing" or providing "excuses" based upon certain answers he provided to the commissioners to hypothetical questions. The Board extrapolated from Bettencourt's testimony at the February 2019 hearing that his "thinking hasn't changed, you weren't seeing yourself how other people see you then." The Attorney General argues the Board properly concluded that Bettencourt "could be dangerous again if released on parole" because Bettencourt did "not appreciat[e] the violence of his actions, the psychological harm he caused [Campbell] and [Mallory], coupled with his responses to the Board indicating he still blames the victims, in part, for his violent reactions."

We have carefully reviewed the record, including the transcript from the February 2019 hearing, keeping in mind the "highly deferential 'some evidence' standard." (*Shaputis II*, *supra*, 53 Cal.4th at p. 221.) We fail to discern any evidence supporting the Board's decision that Bettencourt should be denied parole because he currently poses an unreasonable threat to public safety. We observe that the commissioners did not find that Bettencourt generally lacked insight into his crimes. To the contrary, Bettencourt discussed the causes and circumstances that led to the first degree murder, including the anger and emotions he had experienced at that time, and he spoke at length about the damaging environment he grew up in and the domestic violence he observed between his parents and the bullying he suffered. He further demonstrated an ability to recognize, and deal with his emotions, particularly his anger. Bettencourt acknowledged he had been a "monster" in his youth and the Board found he took full responsibility for the murder.

Rather, the Board appears to have concluded the insight he possessed was not fully developed and suggested he lacked certain "emotional intelligence" and needed to look at his crimes from the victims' perspective. Based on our objective review of the record, Bettencourt's statements in response to certain of the presiding commissioner's

24

hypothetical questions, given the context in which they were made, do not constitute some evidence that he poses an unreasonable risk to public safety.

At the hearing, Bettencourt acknowledged and understood he committed domestic violence against Campbell and that she feared him, even though he had not recognized her fear when he was younger. There is no evidence at the hearing that Bettencourt currently blames Campbell or Mallory for his crimes or that he tried to justify his actions. Rather, the Board's questions were hypothetical questions about whether the *victims* could have prevented the crimes in any way. Moreover, even crediting the commissioner's inference that Bettencourt was still unable to see himself as the victims saw him then or displayed a lack of emotional intelligence, this inference is untethered to any evidence that he currently poses an unreasonable threat to society.

On appeal, the Attorney General points to the statement in Dr. Marrapese's report that Bettencourt had a "slight proclivity" to blame Campbell. We do not view this isolated statement in a report that otherwise concludes he is at low risk (consistent with a report from a different psychologist from three years prior in 2015 that opined he was low risk) as evidence that he currently poses an unreasonable risk to public safety. Nor does the doctor's statement that Bettencourt has continued "to work towards addressing underlying dynamics that led to the crime, yet continues to struggle [to] identify personality traits, and how these traits may pose future problems if [he] were again to become involved in a significant romantic relationship" is evidence he currently poses an unreasonable threat to society, given it involves speculation about how he may (or may not) act in a future relationship, should he have one.

*Poole*, a case relied upon by Bettencourt and which the Attorney General fails to address, is instructive. In *Poole*, the First District Court of Appeal, Division 2, rejected as some evidence the Board's finding that an inmate, who like Bettencourt was a youth offender, posed an unreasonable risk based on the Board's finding the petitioner's " 'version' and 'understanding' of the life crime 'significantly lacking.' " (*Poole*, *supra*,

25

24 Cal.App.5th at p. 973.) The appellate court further noted that the Board "paid lip service" to its consideration of youth factors and rejected his attempts to give great weight to the "mindset of a 19-year-old drug dealer immersed in a violent, criminal lifestyle." (*Id.* at p. 982.)

Here, we see no evidence that the Board actually gave any weight to the youth factors, notwithstanding the Board's assertion that it gave "great weight" (§ 4801, subd. (c)) to them. It is true that the Board observed that Bettencourt's immature and impulsive thinking and poor decision-making at the crime was consistent with the behavior of a 23 year old, including his extreme obsession with his former girlfriend Campbell. The Board also acknowledged Bettencourt was fueled by emotions at the time of the murder. We further recognize that we may not reweigh the factors considered by the Board. (See *Shaputis II*, *supra*, 53 Cal.4th at p. 210.) However, the Board appears to have both acknowledged that Bettencourt has exhibited "growth and increased maturity" (§ 4801, subd. (c)) since the crimes and simultaneously gave that factor no weight in its analysis. To the contrary, the Board appeared to reject these factors outright without explanation and instead focused almost exclusively on the violence of the crimes and Bettencourt's few answers given in the conversations noted above. For the reasons explained above, these answers did not constitute evidence that Bettencourt currently presented an unreasonable risk to public safety.

Given the record as a whole, the Board's rejection of these youth-related factors in this case appears arbitrary and capricious. The record contains no evidence supporting the Board's conclusion that Bettencourt's thinking had not changed in the over 40 years since his violent history in his youth. To the contrary, the evidence reflects he has matured and improved in a positive direction.

The Attorney General relies in part on *Shaputis II* to support the Board's decision. In *Shaputis II*, the California Supreme Court concluded some evidence supported the decision to deny parole based on factors including the prisoner's lack of insight and

26

failure to accept responsibility for his actions. (*Shaputis II*, *supra*, 53 Cal.4th at p. 199.) In that case, the inmate was not a youth offender; he had murdered his wife by shooting her at close range when he was 50 years old, and had committed many years of domestic abuse and child molestation prior to the killing. (*Id.* at pp. 201, 214.) The inmate had refused to speak about the murder at the hearing, declined to be interviewed by a CDCR psychologist, and offered no rational explanation for the killing and failed to discuss the murder at all in his written statement. (*Id.* at pp. 211, 213.) Those facts are materially distinguishable from the facts here, and therefore *Shaputis II* does not support the Board's decision.

Bettencourt submitted to a comprehensive psychological evaluation by a CDCR psychologist, spoke at length and in detail at the February 2019 hearing about the murder and post-murder crimes, as well as what he learned from self-help groups, and the domestic violence in his parents' relationship, admitted he committed domestic violence against Campbell when he broke her jaw, and admitted to killing Mallory. There was no suggestion that his explanation for his crimes—centered on the love triangle between himself, Campbell, and Mallory—was irrational, and the Board explicitly found that his "suicide by cop" explanation for his shootout with the police was "plausible."

We also conclude that *In re Rozzo* (2009) 172 Cal.App.4th 40, a case dealing with racial animus upon which the Attorney General also relied in the trial court, does not support the Board's decision. *Rozzo* was decided before the youth offender provisions were enacted (see fn. 7, *ante*), and therefore it has limited relevance to Bettencourt. In any event, *Rozzo* involved circumstances materially distinguishable from the present case, as the inmate lacked insight into "the reasons why he committed" murder, (*id.* at p. 61) failed to acknowledge his direct participation in the killing, and failed to acknowledge that he was motivated by racial hatred despite strong evidence that he was so motivated. (*Id.* at pp. 62–63.) Here, by contrast, it is beyond dispute that Bettencourt took full responsibility for the murder and discussed the reasons why he did it (i.e., his

27

anger at Campbell's betrayal and the emotional state he was in), even if those reasons did not justify the cruel and heinous murder.

We note that the Board rejected the then-most recent risk assessment report from the CDCR psychologist (Dr. Marrapese) finding Bettencourt to be at low risk for future violence as compared to other parolees. While the Board considered her report, it ultimately found it flawed in certain respects. The commissioners appeared to focus on the summary of the crime in her report, speculating from this summary that she did not understand the full scope of his criminality. However, her report took the summary from a prior appellate decision from this court and further stated she had considered his central file and the prior report from Dr. Taylor, which notes for example that Bettencourt victimized the man who Bettencourt bound and robbed when traveling with Campbell after the murder and, pre-murder, victimized Campbell by fracturing her jaw when she confessed to having an affair. Second, the Board disagreed with her overall assessment that Bettencourt had acted on "impulse" but did not explain how that distinction mattered to the determination of his current risk today, over 40 years after the murder. The Board appeared to agree with her view that he had been "fueled by emotion[]" when he murdered Mallory. The Board did not otherwise explain why it rejected her conclusion about Bettencourt's low risk of violence as compared to other parolees. We do not agree with the Attorney General that the Marrapese report provides any evidence supporting the Board's 2019 parole decision.

Finally, the Attorney General emphasizes that Bettencourt used Campbell as a "human shield" during the police shootout before his arrest. It is true that Bettencourt denied using her as human shield at the hearing, although a contemporaneous police report from the Monterey County Sheriff's Department in 1975 states he used her as a "hostage and a shield during one period where [Bettencourt] was reloading." Bettencourt explained to the Board that he had just wanted to show Campbell and had told her to get back in the car, an explanation the Board appeared to accept as it did not rely on his

28

statement denying he used her as a human shield to support its parole decision and did not express that his explanation offered at the hearing was implausible. (Cf. *Shaputis II*, *supra*, 53 Cal.4th at p. 216 [noting that "an *implausible* denial of guilt may support a finding of current dangerousness"].) Moreover, it is undisputed that the underlying crimes related to the police shootout involved assault with a deadly weapon and not the attempted murder of either Campbell or the police involved. Finally, in light of Bettencourt's plausible explanation, the Attorney General provides no explanation of how Bettencourt's denial today of using Campbell as a human shield over 40 years ago relates to his current dangerousness to the public.

To the extent the Board may have been implicitly concerned that Bettencourt would repeat acts of domestic violence on other intimate partners should he be released, we are unable to discern any evidence supporting such a conclusion. Bettencourt had matured and availed himself of domestic violence classes, and there was no evidence he committed domestic violence in his earlier marriage that ended in divorce in 1994. The Board's decision may not be supported "merely by a hunch or intuition," (*Lawrence*, *supra*, 44 Cal.4th at p. 1213) and therefore on this record this factor does not support its conclusion.

We decide that there was no evidence supporting the February 2019 decision by the Board that Bettencourt currently poses an unreasonable threat to public safety and was ineligible for parole. We therefore affirm the trial court's order requiring a new parole hearing consistent with the principles of due process.[9]

### III. DISPOSITION

The trial court's March 20, 2020 order is affirmed.

---

[9] Given our affirmance of the trial court's order on due process grounds, we need not consider Bettencourt's alternative argument that his continued incarceration violates the Eighth Amendment.

_____
                                      Danner, J.

WE CONCUR:

_____
Greenwood, P.J.

_____
Elia, J.

**H048194**
*In re Bettencourt on Habeas Corpus*